UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
ADRIENNE FELTY,

*Plaintiff,*

-against-

REGENERON PHARMACEUTICALS, INC.,

*Defendant.*

-------------------------------------------------------------x

18 cv _____

**COMPLAINT**

*Jury Trial Demand*

Plaintiff, ADRIENNE FELTY (hereinafter "Plaintiff"), by and through her attorneys, Goddard Law

PLLC, whose offices are located at 39 Broadway, Suite 1540, New York, NY 10006, alleges upon

knowledge with respect to herself, and upon knowledge, information and belief as to all other matters, as

follows:

**PRELIMINARY STATEMENT**

1.     This is a civil action brought on behalf of Plaintiff Adrienne Felty against Defendant

Regeneron Pharmaceuticals, Inc. for gender discrimination in violation of Title VII of the Civil Rights Act

of 1964 ("Title VII"), the New York State Human Rights Law (N.Y. Exec. Law 290 et. seq.) ("NYSHRL"),

and the New York City Human Right Law ("NYCHRL"), along with any and all other causes of action

which can be reasonably inferred from the facts as set forth below.

**JURISDICTION AND VENUE**

2.     This Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. §§

1331 and 1343. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28

U.S.C. § 1367 because those claims are so related to the federal claims that they form a part of the same

case or controversy between Plaintiff and Defendant.

3.     Venue is proper in this case pursuant to 28 U.S.C. § 1391 because Plaintiff regularly

provided services to clients in New York City while working for Defendant.

4.     All conditions precedent to filing the instant action have been fulfilled. On or about

1

November 21, 2017, Plaintiff filed a timely Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") which was cross-filed with the New York State Division of Human Rights.  On or about March 27, 2018, the EEOC issued Plaintiff a Dismissal and Notice of Rights, which was received by Plaintiff on or about March 30, 2018. .

5.      This action is being brought within 90 days of Plaintiff's receipt of her Notice of Right to Sue. A copy of Plaintiff's Right to Sue Letter is annexed hereto as **Exhibit A**

## PARTIES

6.      Adrienne Felty (hereinafter "Plaintiff") is a female citizen of the United States who was a resident and domiciliary of Albany County, New York, and then relocated to Dauphin County, Pennsylvania and continued to work for Defendant. At all times relevant, Plaintiff was an "employee" of Defendant as that term is defined by Title VII, the NYSHRL and the NYCHRL.

7.      Defendant Regeneron Pharmaceuticals, Inc. (hereinafter "Defendant") is a large pharmaceutical company with its headquarters located at 777 Old Saw Mill River Road, Tarrytown, New York 10591 and a business address of 81 Columbia Turnpike, Rensselaer, NY 12144. At all times relevant, Defendant was Plaintiff's "employer" as that term is defined by Title VII, the NYSHRL and the NYCHRL.

## FACTUAL ALLEGATIONS

### Plaintiff is Hired by Defendant Owing to her Exceptional Experience and Is Quickly Promoted

8.      Plaintiff is a successful and highly regarded professional with ten years of experience in the Pharmaceutical Quality Assurance field.

9.      In or about January 2014, Plaintiff commenced her employment with Defendant as a Good Manufacturing Practices ("GMP") auditor.

10.      In that capacity, Plaintiff was responsible for performing on-site audits of suppliers and Plaintiff regularly flew in and out of New York City Airports to work for Defendants.

11.      Over the course of her tenure with Defendant, Plaintiff proved herself to be a dedicated,

2

capable, and hard-working employee, and garnered the respect of her colleagues and her superiors.

### Plaintiff Is Promoted to Senior GMP Auditor

12.     Due to her exceptional performance, on or around January 1, 2016, Defendant promoted Plaintiff to a Senior GMP auditor.

### Plaintiff is Thrilled to Work at Defendant, and Excels at Her Job

13.     Plaintiff was thrilled to be working for Defendant, and repeatedly told her Manager and Director how happy she was working there. With her ten years of experience in Quality Assurance, and rising up through the ranks of Defendant, she was exactly where she wanted to be in her career.

14.     Plaintiff worked extremely hard to get where she was at Defendant, including regularly working 70-80 hours a week, and undertaking significant national and international travel. Plaintiff traveled approximately 20-25 days of every month and conducted audits in such far away places as Australia, Japan, Brazil, and Germany.

15.     Every new auditor went through a rigorous training period in which they spent several months being supervised by a Senior Auditor. As a Senior Auditor, Plaintiff was responsible for training new employees.

### Plaintiff Is Promoted Yet Again, and Anthony Cummins Becomes Her Direct Report

16.     In October 2016, Plaintiff was thrilled to find out that she would be in consideration for another promotion at her annual review, to the position of Associate Manager of Quality Auditing.

17.     As part of her promotion she would now be supervising and training an employee who was still in training before becoming a permanent employee, Anthony Cummins (hereinafter "Mr. Cummins"), who was based in Defendant's Ireland office. This meant that she would accompany him on trainings until he was "signed off" to be a fully qualified, independent auditor.

### Defendant Knowingly Passes a Discriminating and Harassing Male Employee from One Female Supervisor to Another Plaintiff

18.     Plaintiff was extremely surprised and caught off guard when, in December 2016, her manager Denise Kemp (hereinafter "Manager Kemp") who was retiring at the end of the year, pointedly

3

took her aside to warn her about Mr. Cummins' behavior.

19.     Manager Kemp warned her that Mr. Cummins was verbally aggressive, responded poorly to criticism, and regularly screamed at her. Manager Kemp told Plaintiff point-blank that she believed he did this because she was a woman, and he was resentful of being managed by a female.

20.     Manager Kemp informed Plaintiff that she had recommended to Human Resources that Mr. Cummins be terminated, but that Human Resources advised her that in order to do so, she first had to put him on a Performance Improvement Plan (PIP), and so Manager Kemp worked with Human Resources to place him on a PIP in November 2016.

21.     Manager Kemp's PIP specifically set forth Mr. Cummins' pervasive aggressive and patronizing behavior towards Manager Kemp. The PIP stated that Mr. Cummins blamed Manager Kemp and others for his mistakes; was "argumentative" and "aggressive " in his "tone and body language" when she provided constructive criticism; "appeared to struggle with being questioned or challenged" and would "not accept feedback."

22.     The PIP also revealed that Mr. Cummins also "sp[oke] over [Manager Kemp] when trying to make a point," did "not appear to listen to what the [she was] saying," and assumed he "knew everything" about Defendant's work. When asked to explain his work, Mr. Cummins arrogantly told Manager Kemp that "it seem[ed] pretty clear [to him]" and said numerous times that he "did not need training." Finally, Manager Kemp wrote that Mr. Cummins failed to respond to client's requests, which may make him and Defendant itself "lose credibility."

23.     Upon information and belief, Mr. Cummins' issues with Manager Kemp were a result of his discriminatory views towards women, and his belief that women did not "belong" in managerial roles. Upon information and belief, Mr. Cummins was hostile to Manager Kemp because she was a woman in a managerial position, and because he did not believe that he, a man, should have to take orders from, or could learn anything from, a woman.

24.     Manager Kemp explicitly warned Plaintiff that should she have incidents with Mr.

4

Cummins, she should document them, and report them to Human Resources.

25.     Manager Kemp also told Plaintiff that because the PIP had been filed with Defendant's Human Resources Department, they were on notice of Mr. Cummins' behavior towards her.

26.     Plaintiff was shocked that Mr. Cummins' behavior was so egregious that Manager Kemp had taken her aside, woman-to-woman, to warn her, and further surprised that Defendant had apparently not acted in any way in response to the PIP, despite being aware of Mr. Cummins behavior.

27.     Plaintiff was immediately concerned, because she was often required to travel with auditors, and would be required to do so with Mr. Cummins. Normally, travelling together involved sharing rental cars, staying in the same hotel, and eating meals together.

28.     However, Plaintiff was getting a promotion and didn't want Manager Kemp to think that she "couldn't handle" Mr. Cummins, and so she did not express her reservations to her, but thanked her for telling her about Mr. Cummins.

29.     Plaintiff assumed that her new manager, Linda Fletcher, (hereinafter "Manager Fletcher") would be her ally in the workplace should anything happen with Mr. Cummins.

**Mr. Cummins Is Immediately Aggressive, Defensive, and Argumentative to Plaintiff**

30.     In January 2017, as part of his employee training, Mr. Cummins first accompanied Plaintiff on audits in order to observe her work, and then began to work on the audits himself with Plaintiff's supervision.

31.     Not surprisingly, Mr. Cummins exhibited exactly the type of behavior that Manager Kemp warned her about. He was belittling, patronizing, and caustic with Plaintiff as a woman, and repeatedly raised his voice at her when she attempted to manage him, though it was her job to do so.

32.     Mr. Cummins treated his male colleagues with dignity and respect, and his behavior was clearly a result of discriminatory animus against women.

33.     Upon information and belief, just as he was to Manager Kemp, Mr. Cummins was hostile to Plaintiff because she was a woman in a managerial position.

5

34.     Plaintiff dutifully marked her criticisms of Mr. Cummins in the audit debriefs, which she completed after every audit, and which she shared with Manager Fletcher.

### Plaintiff Reports Mr. Cummins' Behavior and Poor Performance to Manager Fletcher, Who Does Nothing

35.     As soon as Mr. Cummins started to display aggressive, caustic, and inappropriate behavior, Plaintiff reported this to Manager Fletcher as part of the audit debrief process.

36.     Manager Fletcher told Plaintiff that she felt "they needed to give him a fair shot to succeed" and to continue documenting his behavior and performance in the audit debriefs "to show management's commitment to him becoming successful."

### Mr. Cummins Makes a Threat Against Gays and Lesbians

37.     In or about January 2017, Plaintiff travelled with Mr. Cummins to an audit in Pennsylvania. Returning back from their on-site work, Mr. Cummins and Plaintiff spoke about the cultural differences between the United States and Ireland.

38.     Suddenly, apropos of nothing, Mr. Cummins furiously told Plaintiff that he did not like gays and lesbians, and further told her that that is the way they are raised in Ireland, and that gays and lesbians did not belong in his country.  Plaintiff's mouth dropped open, and she could not believe what she had heard. She was extremely disturbed, and redirected their conversation back to a work topic.

39.     Plaintiff was terrified that Mr. Cummins would engage in discrimination against openly gay employees at Defendant. Even more importantly, she was worried for the safety of any gay auditor with whom Mr. Cummins would travel in the future.

### Mr. Cummins Makes Bizarre and Disgusting Statements About Sex to Plaintiff and a Young Female Co-Worker

40.     After his comment about gays and lesbians, Plaintiff grew more and more uncomfortable with Mr. Cummins when she travelled with him to complete their audits.

41.     In January 2017, Plaintiff and a young female auditor from Defendant's Ireland office (hereinafter "The Female Auditor"), who was, upon information and belief, in her mid-20s, were having

dinner with Mr. Cummins (who was, upon information and belief, in his mid-30s) after an audit in Switzerland.

42. Mr. Cummins suddenly began talking about how his former girlfriend was a "hot model," and that he "liked to brag that [he had] chains on [his] bed."

43. Plaintiff was horrified and saw that the Female Auditor had turned red in the face and was extremely uncomfortable about being forced to listen to Mr. Cummins sexual comments. Cutting him off quickly, Plaintiff told Mr. Cummins sternly that neither she nor the Female Auditor were "interested in his bedroom activities," and she would "appreciate he if kept that to himself." Mr. Cummins waived his hand at Plaintiff and simply giggled inappropriately.

44. Following the dinner, Plaintiff told the Female Auditor that she was very sorry about what Mr. Cummins had said, that it was of course completely inappropriate, and that if she ever had any problems with him, she should report them to her.

45. Plaintiff believed that her scolding of Mr. Cummins was enough to ensure that he did not make a sexual comment at work again.

### Mr. Cummins Is Verbally Abusive and Physically Threatening Towards Plaintiff

46. Despite the fact that she grew more and more uncomfortable around Mr. Cummins, Plaintiff continued to be the commensurate professional. As part of Mr. Cummins' training, Plaintiff accompanied him to another audit in Pennsylvania in or about February 2017.

47. At this audit, Plaintiff could see that Mr. Cummins was taking far too long to finish and, afraid of failing to deliver to their client, Plaintiff took over for him to finish things up before the day ended.

48. When Plaintiff gave Mr. Cummins feedback on his performance later over the phone, which was a required element of her job, she said that he should be "conscious of the time" when doing his audits. Mr. Cummins screamed at her in a loud voice, saying "I didn't ask you to help me, and now you are going to penalize me because you helped??" Plaintiff calmly told Mr. Cummins that it was her job to deliver the audit to the client in a timely manner, but if he watched his timing from then on, she would not have to

7

take over.

49.     Mr. Cummins then screamed at Plaintiff that she had made a "big mistake" in scheduling the audit as a one-day, rather than a two-day audit, and this was why he had run out of time. Plaintiff patiently explained to him that the scheduling of audits was pursuant to Defendant's protocols and would not be changed, but Mr. Cummins again screamed that she was absolutely wrong.

50.     Mr. Cummins furiously and disrespectfully hung up the phone on Plaintiff, which she found shocking. Plaintiff realized that it would be impossible to train Mr. Cummins when he refused to accept any criticism, felt entitled to scream at his boss, and completely disrespected her.

**Plaintiff Fears for Her Safety Because of Mr. Cummins' Verbal and Physical Threats**

51.     From March 13 to March 17, 2017 Plaintiff and the other employees in Defendant's auditing department met at Defendant's location in Troy, New York for training activities.

52.     To ensure positive communication between managers and employees, Defendant required that each employee meet with their direct report either in person or over the phone for 30 minutes every 30 days, called a "30-30 meeting." Prior to every "30-30 meeting" employees were required to complete a "30-30 form" evaluating how they felt that they had performed in the prior 30 days, and what improvements they believed they could make in the coming 30 days.

53.     While at the same physical location, Plaintiff took advantage of the opportunity to schedule in-person 30-30 meetings with her direct reports.  She scheduled a meeting with Mr. Cummins on March 16, 2017.

54.     When Mr. Cummins arrived at the meeting, he belligerently announced that he had not completed his "30-30 form." When Plaintiff patiently explained that it was Defendant's policy to do so, Mr. Cummins became furious.

55.     Mr. Cummins loudly declared that the entire "30-30" process was "stupid," "useless" and "idiotic," and that he would under no circumstances participate. Plaintiff told Mr. Cummins that if he disagreed with the process he should discuss it with the Human Resources Department, who could pass

along his complaints to higher management at Defendant.

56.     Plaintiff then told Mr. Cummins that for this meeting only, she would review his performance without the "30-30 form," and as she began to do so, Mr. Cummins cut her off furiously and asked her how much longer he would be in training before he was signed off to become a qualified auditor and employee.

57.     Plaintiff explained to Mr. Cummins that the decision to make him a qualified auditor and employee depended on his performance, and that training ended when employees were able to adequately perform the positions they were being trained for.

58.     Hearing this, Mr. Cummins erupted into a rage that Plaintiff had never before seen in a workplace. His face turned red, his fists clenched and raised, and Mr. Cummins screamed that the way she was treating him was "outrageous," that his prior manager, Manager Kemp, had "given him the shaft," and that he was being unfairly criticized over other employees.

59.     Shocked, Plaintiff calmly tried to de-escalate the situation by saying that she was sorry that he felt this way, and to "please calm down." She asked him to give specific examples of how he felt he was treated differently so that she could follow up with her supervisor, Manager Fletcher.

60.     Plaintiff ignored her question and screamed over and over that he always was "given the shaft," but did not provide examples. He shrieked that Plaintiff was "going to do the same thing that [Manager Kemp] did," and, with his fists clenched, towered over the table as if he would suddenly jump and assault her.

61.     Plaintiff became extremely fearful that Mr. Cummins was going to assault her. She very calmly stated that they could not continue the conversation when he was behaving in this way, told him that they would meet again the next day when he had calmed down, and then walked out of the room shaking in fear.

62.     Plaintiff left the room utterly appalled by and frightened of his violent behavior and relieved that she had escaped being physically assaulted in the meeting.

63.     Several of her colleagues approached Plaintiff and said that they had heard Mr. Cummins screaming at her through the closed door of the conference room and asked with concern whether she was ok. Plaintiff responded that she was fine because she was a professional and did not want to get other employees involved.

### Plaintiff Reports Mr. Cummins' Threatening Behavior to Her Manager, Who Does Nothing

64.     Afraid to again cross paths with Mr. Cummins, Plaintiff went to her car in the parking lot and locked herself in. Shaken and still completely terrified, Plaintiff called Manager Fletcher and reported what had occurred. She told Manager Fletcher that she had felt physically unsafe in the room with Mr. Cummins, that she was locked in her car to avoid him, and that she did not know how she could do her job when he reacted this way.

65.     Manager Fletcher was clearly not surprised by the information and did not react to the news of his abuse in any way. Instead, she blandly told Plaintiff to contact Human Resources if she wanted to discuss it further.

66.     Plaintiff told Manager Fletcher that she would contact Human Resources the next day, when she came to work.

67.     Plaintiff was too fearful to join the rest of the auditing team for dinner that evening due to her fear of seeing Mr. Cummins. She instead called a friend for support and talked about the horrible confrontation over dinner with her.   Her friend encouraged her to continue trying to manage him and to complete the "30-30 Meeting" with him, and to stand her ground, and convinced her that Defendant would of course have to act, and that he would be terminated.

### Mr. Cummins Physically and Verbally Threatens Plaintiff Yet Again

68.     The next day, March 17, 2017, Plaintiff and the rest of Defendant's staff reported to the Troy office in the morning.

69.     Even though Plaintiff was extremely shaken up by Mr. Cummins' verbal and physical threats the previous day, she decided to give him the benefit of the doubt. She thought perhaps he had

simply made a mistake but had calmed down, and that when she arrived at work he would apologize to her for his behavior.

70.     Plaintiff also knew that it was her job to finish the "30-30 meeting" with Mr. Cummins, and so, ever the professional employee, decided to try to meet with Mr. Cummins to try again.

71.     Nevertheless, Plaintiff took several precautions just in case Mr. Cummins verbally or physically threatened her again. Plaintiff waited until other employees were in offices surrounding the conference room where she and Mr. Cummins would meet, so that they could intervene if something happened or act as witnesses to what occurred.

72.     Then, after she called Mr. Cummins into the conference room, Plaintiff made sure that she was sitting close to the door, and Mr. Cummins was sitting in the corner, so that she could jump up quickly if anything happened.

73.     Plaintiff first told Mr. Cummins that she was sorry he felt he was treated unfairly and said that if he gave her examples she could follow up with Manager Fletcher. She also reminded him that he could make an appointment with Human Resources if he felt that the "30-30" process was unnecessary.

74.     Plaintiff then returned to reviewing Mr. Cummins' last audit, and specifically the fact that he had not been mindful of the time when executing it, and Mr. Cummins again suddenly interrupted her. He again furiously told her that the fact that he ran out of time was not his fault because the audit was too short, and should have been scheduled as a two-day, rather than a one-day, audit.

75.     When Plaintiff patiently explained to Mr. Cummins that, as she had told him previously, the decision to schedule the duration of a particular audit was made according to the company's protocol and could not be changed, Mr. Cummings immediately interrupted her and erupted in fury yet again.

76.     Mr. Cummins screamed to Plaintiff that she had to admit to her mistake "once and for all," again turned red in the face, and menaced over the table at her as if he was going to push the table over and attack her.

77.     Feeling terrified, and not willing to put herself in a dangerous situation yet again, Plaintiff

11

said that she could not continue the conversation, and walked out of the room.

**Plaintiff Reports Mr. Cummins' Verbal and Physical Threats to Her Director**

78.     Plaintiff immediately emailed the Human Resources Department and told them she had to speak to them about an employee, and walked directly to the office of Teresa Rivenburg, the Senior Director of Auditing (and her and Manager Fletcher's boss) (hereinafter "Senior Director Rivenburg").

79.     Plaintiff told Senior Director Rivenburg about the two incidents, on March 16 and March 17, 2017, in which Mr. Cummings verbally and physically threatened her.

80.     She reminded Senior Director Rivenburg that Mr. Cummins had exhibited similarly outrageous behavior with his previous manager, that such behavior had been reported, and that he was already on a PIP.

81.     Plaintiff said that in addition to fearing for her safety and that of other employees, she was extremely concerned with an out-of-state audit she was scheduled to complete with Mr. Cummins the following Monday, and again reiterating that she did not, under any circumstances, feel safe traveling with him.

82.     Senior Director Rivenburg told her that Mr. Cummins would be taken off of the audit, but again directed her to Human Resources to ask them about next steps.

**Plaintiff Reports Mr. Cummins' Verbal and Physical Threats to Human Resources**

83.     After her meeting with Senior Director Rivenburg, Plaintiff walked directly to Human Resources and spoke with Teresa Thompson, Associate Director of Human Resources ("Associate Director of HR Thompson") and Filomena Grady, Senior Manager of Human Resources (hereinafter "Senior Manager of HR Grady") and told them about the incidents on March 16 and 17.

84.     Plaintiff outlined her other concerns regarding Mr. Cummins, including his continuously aggressive behavior towards her and his former supervisor Manager Kemp, and reminded them that Mr. Cummins was on a PIP.

85.     In addition, she also gravely informed them of the discriminatory comment towards gays

12

and lesbians he made while on the audit with her and stated that she was afraid for the safety of Defendant's gay and lesbian staff.

86.    Then, eager to protect her female and gay colleagues from what she believed was an unsafe and hostile employee, Plaintiff asked Associate Director of HR Thompson and Senior Manager of HR Grady to speak to the female, gay and lesbian employees at Defendant to find out if they had similar interactions with Mr. Cummins or felt threatened by him.

87.    Senior Manager of HR Grady and Associate Director of HR Thompson agreed to take Mr. Cummins off of her audit for the following Monday. They also told her they would to speak to Mr. Cummins that day, and that they would interview members of the auditing staff that week.

### Mr. Cummins Admits That He "Raised His Voice" with Plaintiff, and Human Resources Asks Plaintiff for a Formal Statement

88.    Senior Manager of HR Grady and Associate Director of HR Thompson contacted Plaintiff the following week, on March 24, 2017, to give her an update on her complaint against Mr. Cummins.

89.    Shockingly, they reported that Mr. Cummins had admitted that he had "gotten heated" and "raised his voice" during his two conversations with her but had nothing but praise for Plaintiff as a manager. Mr. Cummins did not, however, admit that he had been verbally or physically threatening to her.

90.    Senior Manager of HR Grady and Associate Director of HR Thompson asked Plaintiff to submit a formal written statement to Defendant's Human Resources Department in Ireland. Plaintiff was surprised that she was being asked to communicate and interact with an HR Department in another country, but she assumed that both Human Resources offices would be involved, and she looked forward to the situation getting resolved as quickly as possible.

91.    Senior Manager of HR Grady and Associate Director of HR Thompson explicitly directed Plaintiff that, because she had already reported the March 16 and 17 incidents to them, she should focus her written statement on her other concerns about Mr. Cummins. They promised to forward on a report of her initial complaint regarding incidents to Defendant's Human Resources Department in Ireland.

92.    Senior Manager of HR Grady and Associate Director of HR Thompson told Plaintiff that

13

they were recommending that Mr. Cummins be terminated from Defendant. They also told her that they had spoke to Manager Fletcher, Director Rivenburg, and Patrice Gilooly, the Vice President of Quality (hereinafter "VP Gilooly"), who was Director Rivenburg's boss, and that they, too, had approved the termination.

93.     However, Senior Manager of HR Grady and Associate Director of HR Thompson cautioned Plaintiff that any termination would have to be done through Defendant's Human Resources Department in Ireland, as Mr. Cummins was an employee in the Ireland office.

94.     Plaintiff was utterly confused how "Irish law" could allow a male employee to threaten and harass a female employee in the United States, and how any of Defendant's employees conducting business on behalf of Defendant in the United States could not be liable under United States discrimination and harassment law.

95.     However, Plaintiff believed that, nonetheless, Ireland would agree that Mr. Cummins should be terminated, and that she would soon be free from threats and fear in her workplace.

### Two Women and a Gay Man Tell Plaintiff That They Also Reported Mr. Cummins' Behavior to Human Resources

96.     Also on March 24, 2017, not surprisingly, Senior Manager of HR Grady and Associate Director of HR Thompson reported to Plaintiff that they had spoken to other members of her team and that they, too, reported a "pattern" of "inappropriate" behavior.

97.     In the coming days, two women and one gay man came forward to Plaintiff and told her that they had been approached by Human Resources and asked about Mr. Cummins' behavior.

98.     One woman and one gay man, who had heard Mr. Cummins scream and threaten Plaintiff on March 16, 2017, corroborated Plaintiff's story of the incident to Human Resources.

99.     A second woman also said that she had told Human Resources other ways Mr. Cummins was inappropriate to her. The woman did not volunteer how Mr. Cummins was inappropriate, and, knowing that the woman's interview with Human Resources was confidential, Plaintiff did not press for details.

14

### Plaintiff Files an Extensive Formal Statement Concerning Mr. Cummins, Detailing Both His Harassing Behavior and His Extremely Poor Performance

100.    Plaintiff submitted an extensive complaint detailing Mr. Cummins' harassing and discriminatory behavior, as well as his poor performance, to Defendant's Human Resources Department in Ireland on March 27, 2017.

101.    Plaintiff told Human Resources about the incident in which Mr. Cummins "escalated to the point where he was physically upset and appeared to be reaching an aggressive point." She stated, "I removed myself from the situation; however, I no longer feel comfortable to be in a position alone with [Mr. Cummins]."

102.    She detailed that Mr. Cummins was not interested in participating in meetings "critical to his success in performing audits" and came to work late and left work early. His "quality of work [was] lacking" and "[m]any instances of inaccurate information" were found in his audit reports, including that he had completed a task in an audit that he clearly had not. In addition, clients commented to Plaintiff on the fact that Mr. Cummins' questions to them were "unreasonable" and that he was "disorganized" and "pushy."

103.    Mr. Cummins "did not take responsibility for his own performance, including errors, but rather positions the blame on onto other people."

104.    She reminded Human Resources that his behavior impacted "both the people he [was] working with in the auditing department, and also the reputation of [Defendant] when on audits with [their] external suppliers." In addition, she stated, Mr. Cummins' "behavior while in the office and auditing are unprofessional and concerning," and his "performance impacts a huge function of [Defendant's] commitment to … produce quality and accurate work."

### HR Fails to Read HR's Report or Plaintiff's Formal Statement

105.    On March 30, 2017, Barry Healy, an Associate in Defendant's Human Resources Department in Ireland (hereinafter "Mr. Healy") contacted Plaintiff to discuss her claim against Mr. Cummins.

106.     When Mr. Healy began asking Plaintiff details of the two incidents in which Mr. Cummins had verbally and physically threatened her, on March 16 and 17, 2017, Plaintiff asked him if he had received a report on the incidents from Human Resources in the United States. Mr. Healy informed her that he had not.

107.     Upon information and belief, Defendant's Human Resources Department in the United States never forwarded Plaintiff's report of these two incidents with Mr. Cummins to Defendant's Human Resources Department in Ireland.

108.     Plaintiff then relayed the story to Mr. Healy, and that Defendant's Human Resources Dept in United States had recommended Mr. Cummins' termination. Mr. Healy said that he would be meeting with Mr. Cummins the next day to get "his side of the story."

### HR Tells Plaintiff to "Overcome Her Issues" with Mr. Cummins that she is "Being Overly Sensitive"

109.     On April 3, 2017, Mr. Healy contacted Plaintiff to inform her that he had spoken to Mr. Cummings. Immediately, Plaintiff noticed that Mr. Healy's tone had changed from the friendly tone he had used in the previous phone call, to a rude and dismissive tone in this one.

110.     Plaintiff was flabbergasted when Mr. Healy told her that Mr. Cummins had utterly denied what occurred with Plaintiff during the two conversations – which was inapposite of what Mr. Cummins had told the Human Resources Department in the United States. Plaintiff reminded him of this, but Mr. Healy said dismissively that he had interviewed him, and that was not what he was reporting to him.

111.     Upon information and belief, once Defendant told Mr. Cummins that he was in danger of being fired for discrimination and harassment, he changed his story to save his job.

112.     Mr. Healy told Plaintiff that because Mr. Cummins had denied her allegations, and she had "no evidence" to suggest that she was unsafe, it was "up to [Plaintiff] to deal with the situation." Shockingly, he immediately turned the tables on Plaintiff and asked, "How do you think you could overcome your issues with Mr. Cummins?"

113.     Mr. Healy then insultingly reiterated that she should "get past this," and suggested that she

16

was being "overly-sensitive."

114.    Plaintiff stood her ground and told Mr. Healy that she did not feel safe traveling with Mr. Cummins, did not feel safe conducting an audit with him, and since these were his primary functions, she did not know how he could continue working at Defendant.

115.    Upon information and belief, because Plaintiff was a woman, Defendant disbelieved Plaintiff's story of verbal and physical harassment over the story of her harasser, a man.

116.    Also upon information and belief, Defendant relied upon gender stereotypes to conclude that Plaintiff was "over-reacting," "over-sensitive," and that her very real fears were not valid.

117.    Apparently, though Plaintiff's male colleague verbally and physically threatened her, as well as the female manager he had reported to before her, Defendant's Human Resources Department falsely instructed Plaintiff that it was her problem, not his.

### Defendant Continues to Refuse to Act, Even when the Harassment Continues

118.    Left with no choice but to quit her job or continue working with him, despite her fear for her safety and the extreme hostility she was being subjected to, Plaintiff continued to do her job as diligently as ever.

119.    In doing so, on April 4, 2017 Plaintiff sent Mr. Cummins a form for him to sign which acknowledged that he had been present at an audit they had done together earlier that year. Mr. Cummins responded curtly via email that he was not willing to sign the forms because he was "awaiting word from Human Resources on whether that should count."

120.    Plaintiff was entirely confused, because these routine forms had nothing to do with the Human Resources inquiry.

121.    Plaintiff responded politely: "Hi Anthony. Could you please explain what you mean?" to which Mr. Cummins shortly reiterated that he was "awaiting word from HR."

122.    Plaintiff was flabbergasted: should Mr. Cummins fail to complete these critical documents, Defendant would be open to liability when audited by the federal Food and Drug Administration (FDA).

123.   Upon information and belief, Mr. Cummins was dangerously stonewalling her so that she could not continue to do her job, in order to harass, intimidate, and interfere with her performance yet again.

124.   Plaintiff forwarded Mr. Cummins' email to Manager Fletcher and asked what she should do. Manager Fletcher again refused to act and again blandly told Plaintiff to take up the issue with the Human Resources Department. Plaintiff was again confused, because Manager Fletcher had the authority to order Mr. Cummins to return the forms to Plaintiff, but she refused to do so.

125.   Plaintiff told Manager Fletcher that Mr. Cummins' behavior was creating a "hostile work environment for her." Surprisingly, Manager Fletcher unhappily acknowledged that she had done some legal research on Plaintiff's complaints and was "afraid that it would come to this."

126.   Manager Fletcher told Plaintiff not to assign Mr. Cummins work tasks and to "leave him alone" until Human Resources resolved the issue.

### Plaintiff Reports Mr. Cummins' Harassment to Human Resources

127.   Plaintiff then forwarded Mr. Cummins' email to Senior Manager of HR Grady, telling her explicitly that him not signing the forms had an impact on Defendant's audit documentations.

128.   Senior Manager of HR Grady responded that she would explore the issue and respond to Plaintiff. Human Resources never contacted her again regarding this issue.

### Mr. Cummins Refuses to Attend a Regularly Scheduled Meeting

129.   On April 4, 2017 Plaintiff called the Ireland office for a regularly scheduled weekly meeting with Mr. Cummins and the Female Auditor. The meeting was necessary to discuss the work they had completed the previous week, as well as upcoming work, and crucial information that Manager Fletcher and Director Rivenburg had asked her to communicate to her auditors.

130.   When the Female Auditor answered her call without Mr. Cummins, the Female Auditor told her that Mr. Cummins asked her to relay the message that "[Plaintiff] would know why he wasn't there."

131.   Plaintiff maintained her professionalism and did not comment, conducting the meeting

with the Female Auditor. She was shocked, however, that Mr. Cummins had gotten the Female Auditor involved in his insubordination of her.

132.    Plaintiff immediately emailed Manager Fletcher and Director Rivenburg and informed them what had occurred, saying that she was very concerned that Mr. Cummins was "not participating in his normal job responsibilities," and that he was involving the Female Auditor.

133.    She further reported that these refusals hindered her ability to do her job, because Mr. Cummins' work tasks were not being completed, and she was forced to assign the Female Auditor more work as a consequence.

134.    Not surprisingly, Manager Fletcher punted the issue to Human Resources yet again, saying that she would have to check with them on how to proceed.

135.    Again, Plaintiff simply did not understand why her Manager, her Director, or Defendant's United States Human Resources Department could not tell Mr. Cummins that he absolutely must follow Plaintiff's orders as his supervisor, or better yet, terminate his employment, or at least his involvement with the United States operations, as they had initially indicated that they intended to do.

136.    Meanwhile, because Manager Fletcher had ordered Plaintiff not to assign work to Mr. Cummins, both Plaintiff and the Female Auditor were forced to perform more work, while, upon information and belief, Mr. Cummins refused to work.

**Plaintiff's Stress Levels Skyrocket Because of Defendant's Failure to Protect Her**

137.    Plaintiff thought back to the many times that she had reported Mr. Cummins' harassment and how Defendant had failed to act, and she realized that nothing would be done to ameliorate her work environment.

138.    Plaintiff knew that she had no managerial or Human Resources support, that no one was taking her very real fears seriously, and that she was "on her own."

139.    Plaintiff thought about this throughout the workday, and had trouble concentrating on her work. She suffered extreme anxiety not knowing when Mr. Cummins would harass or threaten her, or any

19

other female, gay or lesbian employees next.

### Plaintiff's Female Direct Report Informs Her She Is Being Sexually Harassed by Mr. Cummins

140. On April 5, 2017, Plaintiff was surprised to receive an email from her direct report, the Female Auditor, asking to speak to her about "the office environment" in Ireland. This was the same Female Auditor who had been present for the audit in Switzerland when Mr. Cummins made the comment about his former girlfriend being a "hot model," and having chains on his bed.

141. Concerned, Plaintiff immediately called her on the phone. The Female Auditor told Plaintiff that Mr. Cummins had been continuously sexually harassing her in the office in Ireland. Mr. Cummins put his feet on the desk, opened his legs and made lewd hand gestures towards his private parts. He also gave her lewd looks, made repeated sexual comments to her, remained at the office until she left, and repeatedly insisted on walking her home, despite her polite denials.

142. The Female Auditor also said that Mr. Cummins made her uncomfortable by constantly belittling their female managers, first Manager Kemp and now Plaintiff.

143. After hearing her shocking descriptions of harassment, Plaintiff told the Female Auditor that she would have to report this to Manager Fletcher, but she would make absolutely sure that the Female Auditor was safe.

144. Plaintiff decided that given her own official complaint against Mr. Cummins, it was better for the Female Auditor that this information went to Manager Fletcher, who was not involved in a prior investigation.

145. Plaintiff informed Manager Fletcher of the Female Auditor's accusations, and then respectfully said that she would stay out of any further investigation due to her own complaint.

146. Plaintiff called the Female Auditor two days later to ensure that her complaints were being handled and that she was safe. The Female Auditor told her that Defendant asked her to stay home from work so that they could talk to Mr. Cummins about the accusations, which she did.

147. Upon information and belief, Defendant asked the Female Auditor to stay home when they

talked to Mr. Cummins, because they were afraid that he would verbally or physically threaten the Female Auditor once they did.

148.     Because of her own complaint against Mr. Cummins, Plaintiff did not inquire again into Defendant's potential "investigation" of the Female Auditor's claims.

### Plaintiff Is Shockingly Forced to Stay Silent on Manager Fletcher's Phone Call with Mr. Cummins

149.     Meanwhile, Mr. Cummins continued his abject refusal to cooperate with Plaintiff on work items, in order to harass her even further.

150.     Again, Plaintiff knew that if these documents were not completed Defendant would be open to liability when audited by the FDA.

151.     Instead of immediately supporting Plaintiff by telling Mr. Cummins that he must work with his female supervisor, Manager Fletcher bizarrely told Plaintiff that they would call Mr. Cummins together on the phone to resolve the issue, but that Plaintiff must stay "absolutely silent" during the phone call so that Mr. Cummins did not know Plaintiff was on the call. Manager Fletcher further advised that, during the call, Plaintiff should instant message her via Defendant's messaging system if she had any issues with what was being said.

152.     During the phone call, Manager Fletcher discussed the errors Mr. Cummins had made in the report and, not surprisingly, Mr. Cummins was disrespectful and patronizing to another female manager. He refused to agree that his mistakes were errors and argued vociferously that he had worked a day when Plaintiff knew he had not worked.

153.     Plaintiff was devastated that at no point in the phone call did Manager Fletcher admonish Mr. Cummins that he must respect Plaintiff's authority and agree to work with her.

154.     Plaintiff despaired that Manager Fletcher had yet again not supported her.

### Manager Fletcher Ignores Plaintiff's Inquiry About the Alleged "Investigation"

155.     On April 7, 2017, again extremely frustrated that she had not heard anything about the alleged "investigation" of her reports, Plaintiff emailed Manager Fletcy to ask about its status. Manager

21

Fletcher told her that a decision on Mr. Cummins "would be made on Monday" April 10, 2017.

156.    Manager Fletcher did not email her on Monday.

**The Director of the Department Tells Plaintiff that the Situation is "Out of Her Control"**

157.    On April 9, 2017 Plaintiff became increasingly concerned about Mr. Cummins' refusal to work with her at all, and the fact that he had still not been terminated or suspended despite the PIP, her allegations against him, the Female Auditor's allegations against him, and his continued extremely poor performance.

158.    Plaintiff contacted Director Rivenburg and asked for a phone meeting, in which she reiterated that she was frustrated that the issue had not yet resolved, and that Mr. Cummins' behavior was impacting her work within the department.

159.    As had now become a familiar refrain, that Plaintiff had heard several times from both Manager Fletcher and Director Rivenburg, Director Rivenburg refused to act, saying that people "higher than her were working on it" and that Mr. Cummins was "protected by Irish law."

160.    Plaintiff was again devastated that no one – not her manager, her director, or Human Resources – would keep her safe from Mr. Cummins.

**Defendant Bizarrely Allows one of Plaintiff's Direct Reports to be
Mr. Cummins' Representative During Their "Investigation"**

161.    On April 11, 2017, Plaintiff called Manager Fletcher and expressed her frustration that Human Resources had not responded to her inquiries regarding her complaint against Mr. Cummins. She told Manager Fletcher that she was extremely upset about the situation, and again reiterated that his refusal to work with her affected her ability to do her job.

162.    Manager Fletcher dismissed her concerns, telling her that Defendant's Human Resources Department in Ireland was "taking care of it." She then blurted out to Plaintiff that Mr. Cummins had chosen an auditor, Martin Brounstein (hereinafter "Mr. Brounstein"), who reported directly to Plaintiff, as a "representative" in his meetings with Defendant.

163.    Realizing immediately that she had made a mistake in telling this to Plaintiff, Manager

22

Fletcher warned Plaintiff that she must not disclose this to anyone.

164.    Plaintiff was furious that Mr. Brounstein was involved, and made it known to Manager Fletcher.

165.    She told Manager Fletcher that it was not appropriate that Mr. Brounstein would hear Mr. Cummins' furious and one-sided rant against her, particularly since Mr. Cummins screamed at Plaintiff that he had been "given the shaft" and was mistreated by her and Manager Kemp. Plaintiff would have no way of defending herself to Mr. Brounstein because she was prohibited from speaking to him about it.

166.    Plaintiff was afraid that this would affect her working relationship with Mr. Brounstein, because if he, like Mr. Healy from Defendant's Irish Human Resources, believed Mr. Cummins' false narrative, he could become hostile and insubordinate of Plaintiff as well.

167.    In addition, Plaintiff knew Mr. Brounstein to be a gossipy employee, and had no doubt that he would be talking about these private meetings with other employees at Defendant. Upon information and belief, Mr. Brounstein told other employees that the investigation was "bogus" and that it was Mr. Cummins who was being mistreated.

168.    Manager Fletcher told Plaintiff that she would confer with Defendant's Human Resources Department in Ireland, but Manager Fletcher never followed up with Plaintiff on this issue.

### Plaintiff Submits a Formal Request to Remove Mr. Cummins from her Team

169.    Plaintiff was utterly and completely frustrated with Defendant's failure to act on her reports of discrimination and a hostile work environment.

170.    On April 13, 2017, Plaintiff submitted a formal request to remove Mr. Cummins from her team to Manager Fletcher. She knew that with this formal written request, Defendant's management could no longer ignore her complaints.

171.    Plaintiff explicitly told Manager Fletcher that she was frustrated that she had "done nothing" about Mr. Cummins threats and harassment, and that she absolutely wanted her request to be formally submitted to management, and Human Resources.

23

172.    Manager Fletcher told her that she would submit the request to Human Resources. Plaintiff anxiously awaited the answer to her request.

## Human Resources Tables Plaintiff's Formal Request to
## Remove Mr. Cummins From Her Team

173.    On April 19, Manager Fletcher emailed Plaintiff to inform her that she had spoken to Human Resources about her formal request to remove Mr. Cummins from her team, but Human Resources advised her to wait until the alleged investigation was "closed."

## Plaintiff's Manager and Director Tell Her That This Was "Out of Their Hands"

174.    As Plaintiff prepared to go on a long pre-arranged vacation and medical leave, she called Manager Fletcher to make arrangements for her absence.

175.    When Director Rivenburg joined the call, Plaintiff used the opportunity to again express her concerns that Defendant's "investigation" into her complaints against Mr. Cummins were taking so long, and her frustration that nothing was being done regarding her complaint.

176.    Plaintiff told them that given how this affected her ability to do her job, it must occur before she returned from leave.

177.    Yet again, Director Rivenburg told Plaintiff with an annoyed tone in her voice that Mr. Cummins' termination was "up to Irish law," and was "out of their hands." Plaintiff knew that Director Rivenburg was clearly annoyed with Plaintiff for pushing the issue.

178.    Plaintiff started her vacation on May 1, 2017 and began her medical leave on May 9, 2017.

## Plaintiff's Attorney Writes a Letter to Defendant,
## Iterating Explicitly the Discrimination and Harassment Plaintiff Experienced

179.    Anxious about returning to work and frustrated with the lack of support she received and the blatant discrimination and harassment she experienced, while on medical leave Plaintiff hired a lawyer.

180.    On June 13, 2017, Plaintiff's attorney wrote a letter to Defendant outlining the discrimination and harassment, and Defendant's failure to act.

181.    Defendant never acknowledged that they received the letter, or contacted Plaintiff's lawyer

to discuss its contents.

### Plaintiff Resigns Because Defendant Failed to Support Her Against a
### Threatening and Discriminating Male Employee

182.     Plaintiff had time during her medical leave to reflect on what had occurred in the previous year, and the abject lack of support she had received from Defendant concerning her complaints of discrimination and harassment.

183.     She realized that she could not continue working for a company that did not support her as a woman when she was verbally and physically threatened by a poor-performing male employee, and when that male employee hindered her ability to perform her job.

184.     With a heavy heart, on July 1, 2017, Plaintiff submitted a short resignation letter to Manager Fletcher, with copies sent to the Human Resources Department, saying simply that she was resigning, and her last day at the office would be July 14, 2017.

### Defendant Allows Mr. Cummins to "Voluntarily Resign" from Defendant

185.     When Plaintiff returned to work on July 3, 2017, she saw an email from Manager Fletcher to the Department stating that Mr. Cummins had "voluntarily resigned."

186.     She was furious that Mr. Cummins had been allowed to "voluntarily resign," rather than him being terminated by Defendant because of his behavior and poor performance.

187.     Upon information and belief, knowing that Mr. Cummins had indeed verbally and physically threatened Plaintiff, made homophobic reports, and committed sexual harassment against the Female Auditor, Defendant still allowed Mr. Cummins to "voluntarily resign," rather than terminate him, as was necessary given his egregious and illegal behavior.

### Plaintiff's Manager Tells Her That the Reporting Structure Would Change to
### Avoid Another "Difficult Situation"

188.     Manager Fletcher was shocked when Plaintiff, a highly successful and valuable member of their company, resigned.

189.     She asked Plaintiff to stay, and then stated that she would take Mr. Brounstein off of her

25

team if she stayed.

190.     In doing so, Manager Fletcher patronizingly told Plaintiff that this would avoid "another difficult situation."

191.     Plaintiff was furious, because though Defendant had created the situation by allowing Mr. Brounstein to be directly involved in an investigation into her complaint against her direct report, they believed a "solution" was to punish Plaintiff by removing a direct report from her supervision.

192.     Plaintiff saw that yet again, Defendant blamed Plaintiff for the situation and punished her by taking away her authority and responsibility as a manager.

193.     Plaintiff plainly told Manager Fletcher that she had not changed her mind about her resignation.

### Human Resources Shockingly Offers Plaintiff Empty Apologies, and a Lower-Level Position Within Defendant

194.     In or about the week of July 10, 2017, Senior Manager of HR Grady contacted Plaintiff on the phone and apologized for the "Cummins situation" and "how it was handled," and then attempted to spin it into something positive by describing it as a "learning experience."

195.     Bizarrely, Senior Manager of HR Grady then "offered" Plaintiff a new position in the company.  Insultingly, the new position was a demotion, not at all in her area of expertise, and, most insultingly, not a management position.

196.     Shocked, but ever the commensurate professional, Plaintiff politely declined the offer, saying that her resignation still stood.

### The Vice President Tells Plaintiff That the Situation with Plaintiff was "The Worst She Had Ever Seen in All Her Years of Working"

197.     On July 13, 2017, Plaintiff received a request for a meeting from VP Gilooly, who held the highest-level position in Plaintiff's department.

198.     As soon as Plaintiff sat down to meet with her, VP Gilooly apologized for the way that Plaintiff's complaint was handled, saying that this was "the worst situation she had ever seen of an

employee's actions in all of her years of working."

199.     Plaintiff calmly described her great frustration with the alleged "investigation," and the fact that she was wholly unsupported by her managers or by Human Resources. She also told VP Gilooly that the situation had gravely impacted her both emotionally and professionally, and that had Defendant not failed to support her, she would have gladly stayed with the company for many years.

200.     VP Gilooly asked Plaintiff if there was anything they could do to keep her.  Plaintiff told VP Gilooly that she could never accept the insulting position that she had been offered, as it was a demotion, was not in her area of expertise, and was not a managerial position. Plaintiff told her that there was no way she could work for a company that did not support her or other women from discrimination.

201.     Plaintiff's last day was July 14, 2017.

### CLAIMS FOR RELIEF
### AS AND FOR THE FIRST CAUSE OF ACTION

*(Gender Discrimination - Disparate Treatment in Violation of Title VII of the Civil Rights Act of 1964, The New York State Human Rights Law and the New York City Human Rights Law)*

202.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

203.     Plaintiff is a female and is therefore a member of a protected class.

204.     Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

205.     As set forth in detail above and herein, Defendant subjected Plaintiff to disparate treatment on the basis of her gender.

206.     The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment.

207.     As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, and the loss of enjoyment of the

ordinary pleasures of everyday life.

208.     Accordingly, Defendant discriminated against Plaintiff by virtue of treating Plaintiff less well than her similarly situated colleagues outside her protected class in violation of her statutory rights as guaranteed by Title VII, the NYSHRL and the NYCHRL.

**AS AND FOR THE SECOND CAUSE OF ACTION**
*(Gender Discrimination - Hostile Work Environment in Violation of Title VII of the Civil Rights Act of 1964, the NYSHRL and the NYCHRL)*

209.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

210.     Plaintiff is a female and is therefore a member of a protected class.

211.     Plaintiff was qualified to work as an employee for Defendant and she satisfactorily performed the duties required by the position she held at Defendant.

212.     As set forth herein and above, Defendant subjected Plaintiff to a hostile work environment on the basis of her gender.

213.     The discrimination Plaintiff suffered while employed with Defendant was severe and pervasive, unwelcome by Plaintiff, and would be offensive to a reasonable person.

214.     The discrimination that Plaintiff suffered while employed by Defendant severely affected the terms and conditions of her employment.

215.     As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

216.     Accordingly, Defendant discriminated against Plaintiff by virtue of subjecting Plaintiff to a hostile work environment in violation of her statutory rights as guaranteed by Title VII.

## AS AND FOR THE THIRD CAUSE OF ACTION
*(Retaliation in Violation of Title VII of the Civil Rights Act of 1964, the NYSHRL and the NYCHRL))*

217.     Plaintiff repeats and re-alleges each and every fact as set forth above, herein.

218.     As set forth in detail above, Defendant subjected Plaintiff to discrimination, a hostile work environment, and an atmosphere of adverse employment actions and decisions because of her gender in violation of Plaintiff's statutory and constitutional rights.

219.     Plaintiff complained to Defendant multiple times, both personally and through her legal counsel, regarding the rampant discrimination she was subjected to during her employment at Defendant.

220.     Defendant failed to carry out an unbiased and thorough investigation into the merits of Plaintiff's reports of discrimination and a hostile work environment.

221.     In response to Plaintiff's complaint, Defendant subjected Plaintiff to a series of adverse employment actions including, but not limited to subjecting Plaintiff to an increasingly hostile work environment, and constructively discharging Plaintiff.

222.     Accordingly, Defendants, unlawfully and without cause, retaliated against Plaintiff as a direct result of Plaintiff complaint of discrimination and a hostile work environment.

223.     As a direct and proximate result of Defendant's unlawful employment practices, Plaintiff has suffered extreme mental anguish, outrage, severe anxiety about her future, harm to her employability and earning capacity, painful embarrassment among her family, friends, and co-workers, damage to her personal and professional reputation, disruption of her personal life, and the loss of enjoyment of the ordinary pleasures of everyday life.

224.     Accordingly, Defendant retaliated against Plaintiff in violation of her statutory rights as guaranteed by Title VII, *the NYSHRL and the NYCHRL)*.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, it is specifically requested that this Court grant Plaintiff judgment as follows:

    (i)      On the First Cause of Action, awarding Plaintiff compensatory and other damages in an amount to be determined at trial but in any case no less than $2,500,000;

    (ii)     On the Second Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $2,500,000;

    (iii)    On the Third Cause of Action, awarding Plaintiff compensatory damages and other damages in an amount to be determined at trial but in any case no less than $2,500,000;

and

    (iv)    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' fees, together with such other and further relief as this court deems equitable, proper, and just.

Dated:   New York, New York
        June 21, 2018

Respectfully submitted,

GODDARD LAW PLLC
*Attorneys for Plaintiff*

By: _____
    Megan S. Goddard, Esq.
39 Broadway, Suite 1540
New York, NY 10006
Ofc: 646-504-8363
Fax: 212-473-8705
megan@goddardlawnyc.com