UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ADRIENNE FELTY,

                              Plaintiff,

        -against-

REGENERON PHARMACEUTICALS, INC.,

                              Defendant.

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __3/8/2021____
```

No. 18 Civ. 5667 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Adrienne Felty ("Plaintiff" or "Felty") commenced this action against her former employer, Regeneron Pharmaceuticals, Inc. ("Defendant" or "Regeneron") alleging gender-based discrimination, hostile workplace based on gender, and retaliation under both Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 296.[1] Defendant has moved for summary judgment dismissing all of Plaintiff's claims. For the following reasons, Defendant's motion is GRANTED in part and DENIED in part.

## BACKGROUND

The facts herein are drawn from Defendant's Rule 56.1 Statement of Undisputed Material Facts ("Def.'s SUMF") (ECF No. 55), Plaintiff's Local Rule 56.1 Counterstatement of Material Facts ("Pl.'s CSUMF") (ECF No. 64), the parties' declarations, exhibits, and affidavits, and are undisputed except as indicated.

---

[1] Plaintiff withdrew her claim under the New York City Human Rights Law. (Opp'n Mem. at 1 n.1 (ECF No. 62).)

A.      *The Parties*

1.      Defendant Regeneron

Defendant is a company headquartered in Tarrytown, New York that maintains various facilities throughout the world, including in Rensselaer, New York, and Dublin, Ireland. (Def.'s SUMF ¶¶ 1-2; Pl.'s CSUMF ¶¶ 1-2.) During the relevant time period, Patrice Gilooly, Vice President for Quality Assurance, supervised Teresa Rivenburgh, Senior Director of Quality Assurance Operations, who in turn supervised department managers and their direct reports. (Decl. of Linda Fletcher (*See* Decl. of Linda Fletcher ("Fletcher Decl.") ¶ 7 (ECF No. 59); Tr. of May 17, 2019 Dep. of Filomena Grady "Grady Dep." at 81 (ECF Nos. 63-5, 60-2).) Denise Kemp and Linda Fletcher both served as managers in the Quality Assurance Department. Within the Quality Assurance department is "Regeneron's GMP Auditing Department[, which] is responsible for, among other tasks, conducting audits of manufacturing sites and suppliers and internal departments and processes to ensure that policies, standards and regulations are followed." (*Id.* ¶¶ 5-6.) New auditors go through a training period during which they are familiarized with different types of audits and the leading and supporting roles. (Tr. of May 8, 2019 Dep. of Adrienne Felty ("Felty Dep.") at 50, 66 (ECF Nos. 63-3, 60-1).)

Defendant has Human Resources ("HR") staff in both the United States and Ireland. (Grady Dep. at 21.) During the relevant time period, Theresa Thompson and Filomena Grady were United States-based HR staff and Susan Kearney, Erica Gunnigle, and Brian Healy were Ireland-based HR staff. Defendant has adopted policies that expressly prohibit any form of discrimination, harassment, and retaliation, which new employees are advised to review when they commence their employment, are electronically available to all of Defendant's employees via a company intranet, and upon which employees receive annual training. (Decl. of Theresa Thompson ("Thompson Decl.") ¶¶ 8-11 (ECF No. 57); Tr. of May 30, 2019 Dep. of Theresa Thompson

("Thompson Dep.") at 48 (ECF Nos. 63-6, 60-3); Oct. 14, 2019 Tr. of Denise Kemp Dep. ("Kemp Dep.") at 53 (ECF Nos. 63-4, 60-4); Def.'s SUMF ¶¶ 5, 8; Pl.'s CSUMF ¶¶ 5, 8.) Defendant's Anti-Harassment Policy proscribes "any form of sexual or otherwise unlawful employee harassment including, but not limited to, actions, words, jokes, or comments based on an individual's sex, . . . sexual orientation, . . . or any other legally protected characteristic." (Ex. A to Thompson Decl. ("Def.'s Anti-Harassment Policy") (ECF No. 57-1).) The policy further "prohibits any form of retaliatory action against any employee availing him/herself of the benefits of [the complaint] procedure." (Def.'s Anti-Harassment Policy.) Under Defendant's policy, employees who believe they have experienced or witnessed job-related harassment are responsible for reporting the conduct to their supervisors, HR, or any member of management. (*Id.*; Def.'s SUMF ¶ 6; Pl.'s CSUMF ¶ 6.)

       *2.*    <u>Plaintiff Adrienne Felty</u>

In January 2014, Felty began working as an auditor in the Quality Assurance Department for Defendant in the United States. (Ex. B to Thompson Decl. (ECF No. 57-2); Def.'s SUMF ¶¶ 3, 11; Pl.'s CSUMF ¶¶ 3, 11.) Effective January 2016, Felty was promoted to Senior GMP Auditor, which meant that she would be responsible for training new auditors and reviewing their work. (Felty Dep. at 59; Ex. F to Thompson Decl. (ECF No. 57-6); Def.'s SUMF ¶ 15; Pl.'s CSUMF ¶ 15.) In December 2016, Plaintiff learned she would be promoted to Associate Manager for Quality Assurance effective January 30, 2017, which meant she would become the supervisor of two junior auditors, Anthony Cummins and Erin Duncan, who were both remote employees based out of Defendant's Ireland office[2] (Felty Dep. at 60-61; Def.'s SUMF ¶¶ 17-18; Pl.'s CSUMF ¶¶ 17-18; *see* Ex. G to Thompson Decl. (ECF No. 57-7)), and that Plaintiff in turn would be

---

[2] Around mid-April 2017, Plaintiff began supervising a third employee, Martin Brounstein. (Fletcher Decl. ¶ 17; Felty Dep. Tr. at 87; Ex. 3 to Felty Dep. ("Felty Notes") (ECF No. 63-16).)

supervised by Linda Fletcher (Fletcher Decl. ¶ 5; Felty Dep. at 137; Grady Dep. at 150.) Prior to this promotion, Plaintiff reported to Denise Kemp. (Felty Dep. at 61; Def.'s SUMF ¶ 19; Pl.'s CSUMF ¶ 19.)

Plaintiff went on medical leave on May 9, 2017. (Def.'s SUMF ¶ 90; Pl.'s CSUMF ¶ 90.) On June 30, 2017, before she returned from medical leave, Plaintiff submitted her resignation. (Def.'s SUMF ¶ 95; Pl.'s CSUMF ¶ 95.)

### B.    *Cummins Tenure with Defendant and Interactions with Plaintiff*

Anthony Cummins began working for Defendant in May 2016 as an associate GMP Auditor in Defendant's Quality Assurance Department based out of Dublin, Ireland, and was initially supervised by Denise Kemp. (Def.'s SUMF ¶ 19; Pl.'s CSUMF ¶ 19.)

Cummins did not have a male supervisor while he worked for Defendant and Felty testified that there were no male supervisors in her department during the time she worked for Defendant (Felty Dep. at 105, 108-09; *see* Kemp Dep. at 77 (confirming that Cummins did not report to any males).)

#### 1.    Cummins Job Performance Prior to Plaintiff's Supervision

Cummins' employment was subject to a six-month probationary period during which he received training. (Def.'s SUMF ¶ 20; Pl.'s CSUMF ¶ 20.) During the probationary period, Cummins struggled to satisfactorily perform the requirements of his position. (Thompson Decl. ¶ 24; Def.'s SUMF ¶ 21; Pl.'s CSUMF ¶ 21.) The parties agree that Cummins lacked attention to detail, demonstrated poor writing skills, resisted feedback from his manager and trainers, and became argumentative and aggressive when receiving criticism of his performance with which he

did not agree.[3] (Thompson Decl. ¶ 24; Def.'s SUMF ¶ 22; Pl.'s CSUMF ¶ 22; *also* Felty Dep. at 63 (stating that Cummins was the weakest staff member Plaintiff ever trained).)

Kemp testified that when she worked with Cummins, he was "regularly condescending and aggressive" toward her and became red in the face and lost control with her a half dozen times and specifically described two particular instances. (Kemp Dep. at 60-64, 79, 147.) The first instance occurred during a performance review meeting during which Kemp was providing Cummins with feedback and Cummins "became aggressive" and "got in [her] space . . . red in the face, yelling at [her]." (Kemp Dep. at 61.) Kemp reported this incident to Rivenburgh and Rivenburgh was "outraged" by Cummins' behavior. (Kemp Dep. at 76.) During the second instance, which also occurred while Kemp was providing feedback, Cummins "screamed at [her] so loudly and so fiercely on speakerphone" that Rivenburgh, whose office was next door to Kemp's, "came running into [Kemp's] office to see if [she] was ok" (Kemp Decl. ¶ 16; Kemp Dep. at 66-69.) Kemp testified that during both instances she directed Cummins to calm down and the meetings ended without incident. (Kemp Dep. at 65-66, 69-70.)

Kemp testified that based on her supervision and observation, "Cummins 'had a problem' with females, and . . . he believed that males were superior to women, that women were 'weaker' than men, and that he should not have to answer to a woman. He routinely attempted to intimidate females in the office. His beliefs and behaviors were known to [Defendant]." (Kemp Dep. at 59-

---

[3] Kemp testified that Cummins "reacted better" when he received feedback from males than females. (Kemp Dep. at 140, 146.) This opinion is based at least in part on two memoranda Kemp received in September 2016 from audit trainers other than Plaintiff who had interacted with Cummins. The male trainer commented on specific skills Cummins needed to improve and indicated that Cummins accepted feedback but was frustrated by the training process. (Ex. 8 to Goddard Decl. (ECF No. 63-8).) The female trainer noted, inter alia, that when she provided Cummins with feedback, his "body language appeared defiant . . . . He became obstinate in his tone," she further noted that Cummins "is very dismissive of [her] feedback." (Ex. 9 to Goddard Decl. (ECF No. 63-9).) Kemp also testified that a female trainer complained to Kemp about Cummins getting up at screaming at her in a meeting while she and a male colleague were providing Cummins with feedback. (Kemp Dep. at 83-84, 138, 142.) While Kemp's opinion itself is admissible, the second-hand accounts within the memoranda and described by Kemp are inadmissible hearsay. *See* Fed.R.Evid. 801(c), 802.

60.) Kemp was "concerned for both the women on [her] team and the gay people on [her] team" because "Cummins behavior was incredibly scary-he would turn red in the face and completely lose control of himself. [Kemp] was extremely concerned about what he might be capable of. At times [she] was fearful for [her] physical safety because [she] thought that he might hit [her] and [she] told her manager Theresa Rivenburgh that." (Decl. of Denise Kemp ("Kemp Decl.") ¶¶ 6, 8-9 (ECF No. 63-3); Kemp Dep. at 59.)

Kemp avers that she first raised concerns with Rivenburgh about Cummins' beliefs about and behavior toward gay people and women in the spring of 2016 (Kemp Dep. at 59), and that she raised similar concerns "on many occasions" and that on more than one occasion Rivenburgh "expressed to [Kemp] that [Rivenburgh] was appalled by Anthony Cummins homophobia and chauvinistic and hostile attitudes and behavior towards women" (Kemp Decl. ¶¶ 10-12, 17, 20). Kemp further avers that she reported her concerns about how Cummins treated gay people and women to HR, including her concerns for gay and female members of the team who had to work with and travel with Cummins. (*Id.* ¶¶ 13, 15.) Thompson admits that she had "numerous conversations" with Kemp and with HR employees in Ireland regarding Cummins' unsatisfactory performance and how to address it. (Thompson Decl. ¶ 25.)

Kemp testified that in the summer or early fall of 2016 she recommended to Thompson on at least two occasions that Cummins be terminated because he was not a good employee and he was discriminatory in that he did not like females, especially reporting to a female, and was aggressive and condescending toward them. (Kemp Dep. at 127-31, 136-37.) Kemp avers that she "assumed Mr. Cummins would be let go as a liability for the company, but for whatever reason, [she] was told that [she] had to put him on a Performance Improvement Plan [("PIP")]." (Kemp Decl. ¶ 15; Kemp Dep. at 152.) Thompson avers that she, Kemp, and HR staff in Ireland

"collectively decided" to place Cummins on a PIP and to extend his probationary period. (Thompson Decl. ¶ 26.)

On November 7, 2016, Kemp, Thompson and Gunnigle met with Cummins to discuss his unsatisfactory performance and the need to put him on a PIP, which would extend his probation period three additional months through February 2017. (Thompson Decl. ¶ 27; Ex. H to Thompson Decl. (ECF No. 57-8); Def.'s SUMF ¶ 24; Pl.'s CSUMF ¶ 24.) The PIP identified six areas where Cummins' work performance was deficient and needed to improve, including that "during audit debriefs [Cummins] is argumentative and somewhat aggressive in [his] tone and body language." (Ex. I to Thompson Decl. (ECF No. 57-9); Def.'s SUMF ¶ 25; Pl.'s CSUMF ¶ 25.) Kemp testified that she thought the PIP should have included Cummins' aggressiveness toward women but did not because Thompson told her to only include "tangible, measurable items," to comply with Irish law. (Kemp Dep. at 108-10, 116-17, 153.) Plaintiff avers that in November, when it was initiated, Kemp told all of the trainers in the department, including Plaintiff, that Cummins was put on a PIP. (Tr. of May 8, 2019 Dep. of Adrienne Lynne Felty ("Felty Dep. Tr.) at 62, 79-80 (ECF No. 63-2).)

Shortly after the PIP was issued, Kemp gave notice of her resignation. (Kemp Dep. at 44.) Plaintiff avers that in December 2016, after Kemp gave notice of her resignation and before her last day of employment around January 12, 2017, Kemp knew that Felty might be taking over as Cummins' supervisor and warned Plaintiff that Cummins was aggressive with her and regularly screamed at her when she gave him constructive feedback. (Decl. of Adrienne Felty ("Felty Decl.") ¶ 8 (ECF No. 63-1); Felty Dep. at 10, 101.) Felty avers that Kemp told her that Cummins behaved this way towards Kemp because she is a woman and the he especially had issues with being managed by a woman. (Id.) Felty further avers that Kemp told her that Kemp had reported her

concerns about Cummins' behavior to HR. (Felty Decl.¶ 8; Felty Dep. at 101.) Felty testified that despite this warning from Kemp, she "wanted to keep an open mind" and since she had not personally experienced gender-based treatment from Cummins, she "was willing to continue to treat him . . . with an open mind."[4] (Felty Dep. at 102.)

2.   Felty's Pre-Supervision Interactions with Cummins

Felty first met Cummins in May 2016 over email. (Felty Dep. at 63-64; Def.'s SUMF ¶ 31; Pl.'s CSUMF ¶ 31.) Her interactions with Cummins in 2016 were "limited" (Felty Dep. at 71; Def.'s SUMF ¶ 32; Pl.'s CSUMF ¶ 32)—although she was involved in his training (Felty Dep. at 65-66)—as she reviewed his work by telephone and email and did not travel with him (Felty Dep. at 72-73; Def.'s SUMF ¶ 35; Pl.'s CSUMF ¶ 35). Plaintiff testified that when she provided Cummins with feedback during 2016, "typically there was some push-back from his end or a bit of argumentative tone" (Felty Dep. at 74), but there were no problems between them at that point (*id.* at 72-73). She also reported to Cummins' supervisor at the time, Kemp, that Cummins did not accept feedback well. (Felty Dep. at 74-75.)

Before she became his supervisor, Felty had only interacted in person with Cummins during a weeklong training in Rensselaer in March 2016 and a January 2017 auditing trip to Basel. (Felty Dep. at 68-69, 112, 212-13.) During the January 2017 trip, Cummins made a "sexually inappropriate" comment (Felty Dep. at 80-81, 84; Def.'s SUMF ¶ 38; Pl.'s CSUMF ¶ 38), which Felty admits did not convey a sexist attitude (Pl.'s CSUMF ¶ 42). She also admits that she did not immediately report it to Defendant because she believed that telling Cummins that it was unwelcome was sufficient. (Felty Dep. at 83-84; Def.'s SUMF ¶ 41; Pl.'s CSUMF ¶ 41.)

---

[4] Defendant claims that during her deposition Kemp disclaimed having provided any warning to Felty. (Reply Mem. at pp. 6-7 n.2.) However, the pages of the Kemp Deposition on which Defendant claims such statements are transcribed were not provided to the Court by either party.

3.      Closing Cummins' PIP

Fletcher avers that by late January she and Felty "jointly decided" to close Cummins' PIP

and present him with a memorandum identifying areas for continued improvement. (Fletcher Decl.

¶ 10.) On January 27, 2017, Fletcher emailed Thompson, copying Felty and Rivenburgh, stating

that Fletcher and Felty had agreed to close out Cummins' PIP and that they would put together a

memo setting expectations and outlining areas for continued improvement. (Thompson Decl. ¶ 28;

Ex. J to Thompson Decl. (ECF No. 57-10).)

On February 3, 2017, Felty sent HR the memorandum she had drafted with Fletcher closing

out Cummins' PIP. In an email exchange between Gunnigle, Thompson, Fletcher, and Felty on

February 10, 2017, Felty stated "I can't say the assumption that any ongoing issues are 'very minor

in nature' is true as Anthony is still in the training and qualification process . . . . [h]owever, in

regards to items identified in the PIP, he did improve and we tried to convey in the memo the

specific areas where we still think he needs to focus." (Ex. J to Thompson Decl. (ECF No. 57-10).)

The PIP closure memorandum signed by Felty on February 15, 2017 states in relevant part:

> Based on Improvement that has been observed during the period of your PIP,
> specifically with respect to listening, audit report writing, and understanding of
> report expectations, it has been determined that this PIP may be considered closed.
> However, continued sustained improvement is expected in the following areas:
>> Training – Be honest, open, and communicative with your trainer
>> during the training process . . . .
>>
>> Audit Conduct – When auditing with multiple team members, it is
>> important to know the roles/responsibilities and if auditing in a
>> support function, to fulfill the duties of that role . . . . While
>> representing Regeneron in any audit capacity, you must refrain from
>> showing outward signs of disagreement with the lead auditor,
>> frustration or aggression in front of auditees as this is not only a
>> reflection of you, but a reflection of Regeneron . . . .

(Ex. K to Thompson Decl. (ECF No. 57-11).) Felty admits that she was involved in in the

determination to close Cummins' PIP and to put him back into regular training status (Felty Dep.

at 95-96; Def.'s SUMF ¶ 29; Pl.'s CSUMF ¶ 29), but avers that she told Fletcher and Rivenburgh that she objected to closing the PIP because she did not feel she had enough information to determine whether he had succeeded in the actions identified in the PIP or that he would successfully complete the training (Felty Dep. at 96-98). Plaintiff testified that the memorandum she drafted to close out the PIP was not part of the normal process. (Felty Dep. at 98.)

4.      Felty's Interactions with Cummins as his Supervisor

Felty became Mr. Cummins' official supervisor on January 30, 2017. (Def.'s SUMF ¶ 28; Pl.'s CSUMF ¶ 28.) Felty conducted two audits with Cummins in February 2017. After one of the audits, Felty and Cummins had a telephone debrief and as soon as Felty provided him with feedback, he aggressively screamed at her and claimed that it was Felty's time management skills not his deficiencies that caused problems during the audit. (Felty Dep. at 113, 124-25, 177, 179.) Felty testified that Cummins' behavior on this call was inappropriate and insubordinate and that she told him that it was inappropriate for him to raise his voice at her. (Felty Dep. at 121.) She also testified that she followed up the conversation with Cummins with an email documenting her feedback on the audit. (Felty Dep. at 126.)

Felty avers that she immediately reported Cummins' behavior on the debrief call to Fletcher and stated her belief that Cummins was yelling at Felty because she is a woman. (Felty Decl. ¶ 15; Felty Dep.  at 121, 127, 129-30, 135-37.) Felty testified that his was the first time she notified Defendant that she believed she was being treated differently by Cummins because of her sex and that she believed that she was complying with Defendant's policy that employees who believe they are being discriminated against inform Defendant. (Felty Dep. at 139-40, 218.) Felty admits that her notes from the time period do not reflect conversations with Fletcher regarding Cummins prior to March 2017 but avers that she was not required to and did not make notes from every interaction with Fletcher, which were frequent. (Felty Dep. at 168-70.)

She further avers that on the drive back from one of the February 2017 audits, Cummins stated that in his country it was unacceptable to be gay and he felt gays did not belong there. (Felty Dep. at 88-89; Def.'s SUMF ¶¶ 43-44; Pl.'s CSUMF ¶¶ 43-44.) Felty changed the subject (Felty Dep. at 90; Def.'s SUMF ¶ 45; Pl.'s CSUMF ¶ 45), and did not immediately report this comment to Defendant (Def.'s SUMF ¶ 46; Pl.'s CSUMF ¶ 46), but made a note for herself to report it at her next meeting with either HR or management (Felty Dep. at 92). Felty avers that after Cummins made this homophobic comment she "started to realize that Mr. Cummins' patriarchal and misogynist viewpoints ran so deep that any threat to his 'masculinity' by a woman or someone he perceived to be 'like a woman' (a gay man) was a serious problem for him" (Felty Decl. ¶ 14). Plaintiff admits that she never heard Cummins make a sexist comment (Felty Dep. at 183), or other comment about sexual orientation (Def.'s SUMF ¶¶ 47-48; Pl.'s CSUMF ¶¶ 47-48).

Felty further avers that while she was Cummins' supervisor he "regularly screamed at [her] . . . . [A]ny type of normal course feedback resulted in him losing his temper and getting argumentative and aggressive with [her]. He routinely challenged [her] authority . . . . Mr. Cummins would get so upset that he often hung up the phone on [her] in the middle of conversations." (Felty Decl. ¶ 15; Felty Dep. at 137-38, 189-90.) Plaintiff avers that she "regularly reported these screaming incidents to . . . Fletcher, and told her that [she] thought he was behaving this way towards [her] because [she] is a woman."[5] (Felty Decl. ¶ 15; Felty Dep. at 137-38.) Felty believes Cummins was disrespecting her and screaming at her because she is a woman and Plaintiff never saw Cummins be disrespectful to or scream at male coworkers. (*e.g.* Felty Dep. at 193.)

---

[5] Felty believes that Fletcher should have acted on her February 2017 complaints but admits that she is not certain whether Fletcher took any action at the time or whether any of her February 2017 complaints were documented. (Felty Dep. at 207-08, 217-18.)

Fletcher's declaration does not mention any report by Plaintiff to her regarding Cummins' behavior during February 2017. (*See* Fletcher Decl.)

     5.    March 2017 Performance Review Meetings

On March 16, 2017, Felty met in person with Cummins in Troy, New York for a required performance review meeting. (Def.'s SUMF ¶ 53; Pl.'s CSUMF ¶ 53.) At the outset of the meeting, she asked Cummins for the form that he was required to complete in advance of the meeting, and he defiantly told her he had not completed it because he thought Defendant's review process was "stupid and useless." (Felty Dep. at 196-97.) Cummins then asked when he would be certified as a qualified auditor and stated that his prior manager, Kemp, had treated him unfairly. (Felty Dep. at 197; Def.'s SUMF ¶ 55; Pl.'s CSUMF ¶ 55.) When Felty asked for examples of Kemp's unfair treatment, Cummins became loud and red in the face, clenched his fists, and yelled at Felty that she was treating him unfairly like his prior manager. (Felty Dep. at 197-98; Def.'s SUMF ¶ 56; Pl.'s CSUMF ¶ 56.) Cummins stood up with his hands on the edge of the table and Felty got up and left the room. (Felty Dep. at 198-202, 205; Def.'s SUMF ¶ 57; Pl.'s CSUMF ¶ 57.)

Felty "escaped out of the building to [her] car because [she] feared for her physical safety and well-being. [She] was petrified to be in the same building as Mr. Cummins because [she] did not know what he was capable of as he was clearly volatile and violent." (Felty Decl. ¶ 16; *see* Felty Dep. at 206 ("I grabbed my stuff from the conference room and I went to my car"), 302.) In the car, Felty called Fletcher to report Cummins' behavior and Fletcher told Plaintiff to report the incident to HR the next day. (Fletcher Decl. ¶¶ 12-13; Felty Dep. at 206-07; Def.'s SUMF ¶ 58; Pl.'s CSUMF ¶ 58.) Felty did not attend an auditing team dinner that evening because she was scared that she might see Cummins. (Felty Decl. ¶ 16.) Instead, she "regroup[ed]" because she "knew [she] had a job to get done." (Felty Decl. ¶ 17.) She also called Kemp to discuss what had occurred that day. (Felty Dep. at 17-21.)

The following morning, Felty resumed the performance review meeting with Cummins. (Felty Dep. at 208-09; Def.'s SUMF ¶ 59; Pl.'s CSUMF ¶ 59.) Felty was "careful to make sure others were around in neighboring conference rooms and that [she] sat close to the door, so [she] could easily escape if he turned violent and physically aggressive again." (Felty Decl. ¶ 17.) During the meeting, Cummins yelled that the issues from the Jersey Shore audit were the result of a scheduling mistake by Felty—which Felty avers is untrue—and Felty ended the meeting. (Felty Dep. at 209; Def.'s SUMF ¶ 60-61; Pl.'s CSUMF ¶¶ 60-61.) Felty admits that when Cummins became aggressive with her in the meeting, his comments were not "sexist" per se but insists that his verbal abuse of her was related to her gender. (Pl.'s CSUMF ¶ 62.)

Felty admits that she had no in-person contact with Cummins after March 17, 2017. (Fletcher Decl. ¶ 15.)

### 6.    Felty's Obervations of Cummins' Interactions with Male Colleagues

Plaintiff avers that when Cummins interacted with other male managers (*i.e.* supervisors to whom Cummins did not directly report) Cummins' interaction with these men was "friendly, very respectful." (Felty Dep. at 105, 107.) Plaintiff also testified that during an internal audit she "witness[ed] [Cummins] being questioned or pushed on from male colleagues in a supervisory role . . . and [she] did . . . not witness . . . him get aggressive or argumentative," in fact, in the specific situation, because Cummins was the auditor and final decision maker, he should have pushed back. (Felty Dep at 118-20.)

### C.    *Felty's Complaint Against Cummins*

After she ended the meeting with Cummins on March 17, 2017, Felty emailed Grady and Thompson in US HR to request a meeting to discuss Cummins' behavior. (Ex. M to Grady Decl. (ECF No. 58-1); Def.'s SUMF ¶ 63; Pl.'s CSUMF ¶ 63; *see* Grady Decl. ¶ 5; Grady Dep. at 42,

170-71.) Grady responded to Felty's email within minutes and they met early that afternoon. (Def.'s SUMF ¶ 64; Pl.'s CSUMF ¶ 64.)

Before she met with HR, Felty met with Rivenburgh, to whom she described the March performance review meetings as well as the sexually inappropriate comment on the January 2017 audit trip and the February 2017 homophobic comment, and to whom she voiced concern about an upcoming audit she was supposed to do with Cummins on March 20th. Rivenburgh instructed Felty to tell HR that Plaintiff did not need to conduct the upcoming audit with Cummins.[6] (Felty Dep. at 83, 91, 213-14.)

During the meeting with HR, Felty described Cummins' behavior during the performance review meetings and provided Grady and Thompson with a list of individuals who may have overheard Cummins yelling at her. (Grady Decl. ¶¶ 7-8; Thompson Decl. ¶¶ 32-35; Def.'s SUMF ¶ 66; Pl.'s CSUMF ¶ 66.) Felty avers that she also told HR that she believed Cummins was mistreating her because she is a woman and that she "felt it was turning into a hostile work environment." (Felty Dep. at 83, 91, 215-216.) Thompson testified that Felty described her complaint against Cummins as a "hostile work environment." (Thompson Dep. at 16.) Grady and Thompson also testified that, despite respective tenures with Defendant since 2014 and 2001, respectively, neither could recall ever having investigated a claim of unlawful discrimination. (Grady Dep. at 26-27, 56; Thompson Dep. at 15-16, 19-20.) Plaintiff also requested not to have any in-person contact with Cummins in the future. (Felty Dep. at 213, 225; Def.'s SUMF ¶ 67; Pl.'s CSUMF ¶ 67.)

---

[6] Felty's motion papers state that she told Rivenburgh about Cummins' "patriarchal" and homophobic beliefs (CSUMF ¶ 63.1) but neither her declaration nor her testimony state that she told Rivenburgh that Cummins aggression toward her was gender-motivated.

Plaintiff admits that prior to March 17, 2017, she had not told anyone other than Fletcher that she believed Cummins was mistreating her because she is a woman. (Felty Dep. at 166.)

D.     *Defendants' Response to Plaintiff's Complaint Against Cummins*

1.     Defendants' United States Investigation

During the initial meeting on March 17, 2017, Grady and Thompson agreed that Cummins would not travel with Felty for the upcoming audit (Grady Decl. ¶ 9; Thompson Decl. ¶ 36; Thompson Dep. at 49; Def.'s SUMF ¶ 69; Pl.'s CSUMF ¶ 69; *see* Felty Decl. ¶ 24 (emphasizing that Defendant only took Cummins off the March 20 audit because Plaintiff demanded it); Felty Dep. at 215 (describing Plaintiff first raised the March 20 audit issue with Rivenburgh who told Plaintiff to tell HR); Grady Dep. at 170), and agreed that Felty would not have any further in-person contact with Cummins (Felty Dep. at 213, 225; Grady Dep. at 170; Def.'s SUMF ¶ 67; Pl.'s CSUMF ¶ 67). Later that day, Grady and Thompson met with Cummins, who denied raising his voice in the meetings with Plaintiff and claimed he complimented her thorough audit preparations.[7] (Felty Dep. at 307; Grady Dep. at 171-73; Thompson Decl. ¶¶ 37-38; Def.'s SUMF ¶¶ 70-71; Pl.'s CSUMF ¶¶ 70-71.) Grady and Thompson informed Cummins that he would not be permitted to attend the March 20 audit and instructed him to return to his office in Ireland. (Thompson Dep. at 49; Grady Decl. ¶ 10; Grady Dep. at 174; Def.'s SUMF ¶ 72; Pl.'s CSUMF ¶ 72.)

Between March 20 and March 24, 2017 Grady and Thompson interviewed three employees Plaintiff identified as having potentially overheard Cummins yelling at her during the March 2017 performance review meetings, and each employee confirmed that Cummins had raised his voice and did not accept feedback well. (Thompson Decl. ¶ 39; Felty Dep. 301-02; Def.'s SUMF ¶ 73;

---

[7] At one point, Grady testified that Cummins admitted to raising his voice at Plaintiff (Grady Dep. at 105-07); however, at another point Grady testified "I don't remember if Anthony had admitted exactly that he had raised his voice or not, but he had said that things had gotten heated" and that Cummins admitted to having disagreements with Plaintiff (Grady Dep. at 173-74).

Pl.'s CSUMF ¶ 73.) Thompson also spoke with Fletcher and Susan Kearney, an associate director of HR in Ireland. (Thompson Decl. ¶ 39; Def.'s SUMF ¶ 74; Pl.'s CSUMF ¶ 74.) Thompson avers that "[n]o employee, including Felty, alleged that Cummins engaged in any discriminatory conduct during the March 16 and 17 meetings, or at any other time." (Thompson Decl. ¶¶ 40-41.) Thompson further testified that the US investigation was "about [Cummins'] behavior and [Plaintiff] feeling uncomfortable" and that she did not recall whether she investigated whether Cummins had any specific gender bias. (Thompson Dep. at 97.) Thompson "believe[d] [she] had enough information to see that [Cummins] was argumentative with all the employees, women and men the same." (Thompson Dep. at 96; *see also* Thompson Decl. ¶ 41 ("in the course of our investigation, both men and women reported that Cummins did not follow direction well, and that he was argumentative with everyone").)

When asked whether the US investigation "determined whether or not [Cummins] was more argumentative with Adrienne [or other female employees] than he was with men" Thompson testified "no." (Thompson Dep. at 96.) Thompson "did not consider Felty's complaint to be a complaint of discrimination. Based on my conversations with Felty, Cummins, Fletcher, [and others], I understood Felty's complaint to be a complaint about the non-discriminatory insubordination of an employee who Felty supervised." (Thompson Decl. ¶¶ 40-41.) Grady and Thompson testified that they did not recall whether the US investigation involved any inquiry into whether Cummins had a problem with women or gender bias. (Grady Dep. at 162; Thompson Dep. at 96-97.)

Based on their investigation, on March 24, 2017, Grady and Thompson recommended that Cummins be terminated. (Grady Dep. at 84; Thompson Dep. at 175; Def.'s SUMF ¶ 77; Pl.'s CSUMF ¶ 77.) Felty avers that Grady and Thompson told her that, along with Fletcher,

16

Rivenburgh, and Gilooly, that they were recommending that, pending Felty's assent, Cummins be terminated. (Felty Decl. ¶ 18; Felty Dep. at 241-42.) Plaintiff avers that they told her that it was her decision and she agreed to proceed with termination. (Felty Decl. ¶ 18; Felty Dep. at 243.) She further avers that Grady and Thompson directed Felty to write a statement for Defendant's HR staff in Ireland, which they assured Plaintiff was simply a formality, and in which they directed Felty to focus on performance-based concerns about Cummins during audits to demonstrate how he could impact Defendant's professional reputation. (Felty Decl. ¶¶ 18-19.) Thompson avers that she told Felty that the US office was "forwarding our findings to our human resources counterparts in Ireland so they could address Cummins' behavior. We asked Felty to draft a statement summarizing her complaints about Cummins' behavior, which could be forwarded to our colleagues in Ireland, and we committed to providing updates to Felty as we received them." (Thompson Decl. ¶ 43.) Grady avers that they "advised [their] Irish human resources counterparts of [their] investigation and recommended that Cummins' employment be terminated in accordance with Regeneron Ireland's policies." (Grady Decl. ¶ 12.)

On the morning of March 27, 2017 Plaintiff emailed Grady and Thompson a two-page statement summarizing her concerns, which states in relevant part:

> Anthony's demeanor and actions when receiving constructive criticism on his job performance is argumentative and aggressive. Anthony will interrupt feedback sessions if he does not agree with what is being stated and rather than listening to the entire information being provided, will become argumentative to portray his point. Often times, feedback sessions are given over the phone with Anthony (as he is based in Dublin). It is frequent he will have a raised voice on the phone, and I find it hard to communicate as I can't interrupt over his raised voice. During a week both Anthony and I were in the Rensselaer office, Anthony started a conversation regarding him being treated unfairly last year, and Anthony escalated to the point where he was physically upset and appeared to be reaching an aggressive point. I removed myself from the situation; however, I no longer feel comfortable to be in a position alone with Anthony.
> . . . .

> Overall, the concerns I have regarding Anthony impact both the people he is working with in the Auditing department and also the reputation of Regeneron when on audits with our external suppliers. Anthony's behaviors while in the office and auditing are unprofessional and concerning. . . .

(Ex. N to Grady Decl. (ECF No 58-2.) That afternoon, Grady forwarded Plaintiff's written statement to Susan Kearney and Defendant's HR Director, asking about next steps.  (Ex. O to Grady Decl. (ECF No. 58-3); Def.'s SUMF ¶ 80; Pl.'s CSUMF ¶ 80.) Grady testified that during this outreach to Defendant's Irish HR team she first learned that the Irish team would have to conduct their own disciplinary process. (Grady Dep. at 45.)

### 2.    Defendant's Irish Investigation

By letter dated March 30, 2017, Kearney formally advised Cummins of Felty's complaint against him—"on 10 March 2017 you displayed hostile behavior towards her that was not appropriate for the workplace, aggressively raised your voice to her and failed to follow her instructions. Ms. Felty has alleged that this behaviour was repeated, and had been ongoing for a significant period"—and ordered him to participate in an investigatory meeting on March 31, 2017. (Ex. P to Grady Decl. (ECF No. 58-4); Def.'s SUMF ¶ 81; Pl.'s CSUMF ¶ 81.) Cummins was informed that he could have a peer representative at the disciplinary meeting and Cummins selected Martin Brounstein. Felty was concerned that by participating in the investigation as Cummins' peer representative, Brounstein, who was soon to become Plaintiff's direct report, would only hear Cummins' side of the story. (Felty Dep. at 229, 232-33.)

Plaintiff avers that she was "blindsided" when on or around March 30, 2017, Healy contacted her to "interview" her about her claim against Cummins and stated that he would also get Cummins' side. (Felty Decl. ¶ 20.) She was "completely confused because [her] understanding from HR Grady and HR Thompson was that Defendant would be terminating Mr. Cummins and

that the Ireland office was just going to process the paperwork." (*Id.*) Nonetheless, Plaintiff admitted that Healy's first call to her was appropriate. (Felty Dep. at 236.)

Between March 31, 2017 and April 4, 2017, Healy interviewed Cummins and others regarding Cummins' behavior on March 16 and 17, 2017. (Ex. Q to Grady Decl. (ECF No. 58-5); Def.'s SUMF ¶ 82; Pl.'s CSUMF ¶ 82.) When Healy called Felty again on or around April 3, 2017 he "rudely victim-blamed [her] for [her] complaints against Mr. Cummins," told her that she was being overly sensitive and needed to get past this and work with Cummins (Felty Decl. ¶ 22; Felty Dep. at 231, 236, 309-10.) Felty believes Healy's suggestion that Plaintiff was being overly sensitive was a form of gender discrimination. (Felty Dep. at 287.)

Healy concluded in a report dated April 6, 2017, that despite Cummins' claim that he did not "shout, raise his voice, clench his fists or otherwise intimidate [Plaintiff]":

> In light of the corroborating evidence of the occurrence of the incident I find that on balance of probabilities, the evidence supports that [Cummins] did behave in the manner outlined by [Plaintiff] in her complaint. I find that the evidence of independent witness (CB) establishes that [Cummins] was screaming at [Plaintiff]. I prefer the evidence of [Plaintiff] in relation to the meeting. I also believe that [Cummins] was acting aggressively towards her given that the clenched fists while shouting is an aggressive and intimidating gesture. I also note that the [PIP] documentation refers to similar conduct by [Cummins], and therefore I accept [Plaintiff's] evidence that [Cummins'] inappropriate and aggressive conduct was repeated. Based on the findings of fact, I recommend that the matter should now proceed to disciplinary hearing.

(Ex. Q to Grady Decl. (ECF No. 58-5).) On April 7, 2017, Kearney sent Cummins a second letter summarizing Healy's findings, enumerating the allegations against Cummins, and informing him that a disciplinary hearing was scheduled for April 10, 2017. (Ex. R to Grady Decl. (ECF No. 58-6).) The day before the hearing, Cummins informed Kearney that he was sick and requested that the meeting be rescheduled. (Ex. S to Grady Decl. (ECF No. 58-7).) Cummins took medical leave

on April 10, 2017. (Fletcher Decl. ¶ 16; Ex. T to Grady Decl. (noting that Cummins has been on sick leave).)

### 3. Plaintiff's Continued Supervision of Cummins

Plaintiff avers that despite her reports of verbal abuse and physical threats, Defendant required Plaintiff to continue to supervise Cummins. (Felty Decl. ¶ 24; Felty Dep. at 220-21, 224-25; Grady Dep. at 175-76, 231.) Grady testified that, according to Irish law, Cummins' terms of employment could not change during the investigation (Grady Dep. at 195-96, 234), and Grady was not allowed to give Plaintiff updates during the Irish investigation because Plaintiff was involved (Grady Dep. at 152-53). Grady admits that she does not know any details about Irish employment law, including how investigations needed to be conducted under Irish law, and that prior to the Cummins investigation, US HR had not been involved with an Irish investigation. (Grady Dep. at 44-45, 47, 56-57.)

Felty further avers that even though company policy entitled her to receive a copy of Defendant's investigation (Felty Dep. at 228, 245), Defendant kept her in the dark about its investigation of Cummins, including the role that Irish law might have (Felty Dep. at 249).

Felty was "constantly contacting Supervisor Fletcher and Human Resources about the difficulty [she] was having being able to perform her job duties." (Felty Decl. ¶ 30.) For example, on April 4, 2017, Plaintiff emailed Rivenburgh and Fletcher to let them know that Cummins did not show up to the regular monthly group call and that Felty was "having a really hard time being responsible for him." (Ex. 13 to Goddard Decl. (ECF No. 63-13).) She further avers that on or around April 4, 2017, Cummins refused to sign a form acknowledging that he was present for an audit.[8] (Felty Decl. ¶ 27; Felty Dep. at 243-44.) Felty forwarded the relevant email chain to

---

[8] Plaintiff further avers that on or around April 5, 2017, Ms. Duncan called Plaintiff and reported that Cummins had sexually harassed her. (Felty Decl. ¶¶ 32-33; Felty Dep. Tr. at 299-300.) Plaintiff avers that she elevated

Rivenburgh and Fletcher specifically asking for permission to reach out to HR "regarding how [she is] to move forward and continue performing [her] job as a manager in a GMP environment at this point? For example, it is a requirement to document training, but [is she] allowed to push him for this or how [should she] do this?" (Ex. 14 to Goddard Decl. (ECF No. 63-14).) Rivenburgh confirmed that the audit was set up as a training event before it occurred, so Cummins does not get to choose whether it counts. (*Id.*) Fletcher confirmed that Plaintiff could reach out to HR and suggested how Plaintiff could complete the paperwork without Cummins' compliance. (*Id.*) Plaintiff avers that Cummins' "unwillingness to sign off on the audit was a serious concern from a regulatory standpoint, which impacted [her] as it was ultimately [her] responsibility." (Felty Decl. ¶ 27.) Plaintiff further avers that because Cummins did not sign the form, he could not work on follow-up items related to the audit, further increasing Plaintiff's workload because she had to do the follow-up work. (Felty Decl. ¶ 27.) Felty avers that she reported Cummins' refusal to sign to HR, but HR never got back to her. (Felty Decl. ¶ 27; Felty Dep. at 244.) Grady testified that the email exchange amounts to "disagreement on the work." (Grady Dep. at 234.)

On April 5, 2017, Felty emailed Fletcher, stating that Cummins had had a meeting with the client regarding whether certain responses in an audit would be deemed adequate, that Cummins is not yet qualified to make such determinations, that Felty should have been made aware of the meeting because she was the qualified auditor for the audit, and asking Fletcher how and whether Felty could raise this issue with Cummins because she was "unsure when [she] can step in as a

---

Duncan's claim to Fletcher. (Felty Decl. ¶ 32-34; Felty Dep. at 300.) Grady testified that after the Irish investigation of Cummins was already underway, Fletcher reached out to Grady regarding Duncan's complaints against Cummins and that Duncan subsequently spoke to someone on the Irish HR team regarding her complaints. (Grady Dep. at 52, 54.) Thompson testified that that she understood Irish law to require a formal claim in order to start an investigation, which Duncan did not make. (Thompson Dep. at 100.)

manager, but [was] also concerned as the lead auditor of this audit." (Ex. 15 to Goddard Dep. Tr. (ECF No. 63-15).)

Felty avers that on April 6, 2017, Fletcher made Felty join a call with Cummins to review substantive work issues but did not want Cummins to know that Plaintiff was on the phone so Fletcher instructed Felty not to speak and to text message her if there was something she needed to communicate. (Felty Decl. ¶ 28.) Felty avers that actions like Fletcher's stripped Plaintiff of the authority to do her job. (Felty Decl. ¶¶ 28-29.)

Felty avers that on or around April 13, 2017, days after Cummins began his medical leave, she formally asked Fletcher to remove Cummins from Felty's supervision. (Felty Decl. ¶ 35; Felty Dep. at 220-21, 224-25.) On April 19, 2017 Fletcher emailed Plaintiff stating "I was contacted by HR today and they said that they advised us to wait to make the reporting structure change for Anthony until the investigation is closed." (Ex. 10 to Goddard Decl. (ECF No. 63-10).) Thompson and Grady admitted that Cummins' refusal to take orders from Plaintiff, and the limitations on her ability to interact with him would have prevented Plaintiff from successfully doing her job as his supervisor. (Thompson Dep. at 132; Grady Dep. at 194.) Plaintiff testified that even though Cummins was on leave, because she was kept in the dark about the disciplinary proceedings against him, she feared that he could return to work at any time and that she would again be subject to mistreatment by him.

On May 11, 2017, Fletcher sent a memorandum to Grady regarding Cummins' performance, which "documented examples whereby Anthony has failed to demonstrate continuous and sustained performance improvement." (Ex. 11 to Goddard Decl. (ECF No. 63-11).) Specifically, the memorandum critiques Cummins' report/memo writing and lack of appropriate follow up, his inability to receive and use feedback or take responsibility for his actions and his

"unprofessional behavior" which is "creating an adversarial and uncomfortable environment." (*Id.*) The memorandum also notes that around April 5 a member of GMP auditing contacted Fletcher to express concerns about working with Cummins, stating that Cummins is creating a "toxic" environment and that the co-worker was hesitant to lodge a formal complaint because she feared retaliation by Cummins. (*Id.*) Fletcher noted that she informed HR of this complaint. (*Id.*)

### 4.   Cummins' Resignation

Kearney rescheduled Cummins' disciplinary meeting for May 24, 2017. (Ex. T to Grady Decl. (ECF No. 58-8).) On May 22, 2017, Kearney emailed Cummins to confirm that he was medically cleared to return to work and that she had sent a disciplinary notification letter that morning. (Ex. W to Fletcher Decl. at 3 (ECF No. 59-1).) The following day, May 23, 2017, Cummins responded to confirm when he would be able to return to work, informing Defendant that he required certain days off, and requesting additional time to prepare for the disciplinary hearing. (*Id.*) Kearney responded that, since Cummins had been aware of the pending disciplinary hearing since April 7, 2017, no additional preparation time would be afforded. (*Id.* at 2.) Cummins responded in relevant part "[u]pon reflection I have decided that I will not be attending the disciplinary hearing and instead intend to resign from my position with Regeneron." (*Id.* at 1.) Cummins forwarded the email he sent to Kearney to Fletcher to let her know that he was resigning his employment. (*Id.*; Ex. U to Grady Decl. (ECF No. 58-9).) Because Cummins resigned, the Irish investigation was never concluded. (Grady Dep. at 179-81.)

Later that day, Fletcher emailed the GMA distribution list, of which Plaintiff was a member, informing them that Cummins had resigned effective that day. (Ex. X to Fletcher Decl. (ECF No. 59-2); Felty Dep. at 245.)

E.      *Felty's Leave and Separation from Defendant*

Felty went on medical leave on May 9, 2017. (Def.'s SUMF ¶ 90; Pl.'s CSUMF ¶ 90.) She avers that while she was on leave and prior to learning that Cummins had resigned, Plaintiff decided to resign because Defendant was "not supporting [her] in a management position where [she] was being discriminated against." (Felty Decl. ¶ 36; Felty Dep. at 33-34, 246-47.) Nonetheless, Felty admits that she checked emails periodically while she was on leave and learned that Cummins had resigned his employment with Defendant. (Felty Dep. at 239-41, 245-46; Def.'s SUMF ¶¶ 91-92; Pl.'s CSUMF ¶¶ 91-92.)

In mid-June, Felty and Fletcher corresponded about changes Fletcher was making to the audit calendar and Fletcher's plan to hire and train new auditors, including a replacement for Cummins. (Def.'s SUMF ¶ 93; Pl.'s CSUMF ¶ 93.) Felty responded "All of that is great news! I'm feeling pretty good, but am worried I'm not going to physically be up to traveling for some time." (Ex. Y to Fletcher Decl. (ECF No. 59-3).)

On the morning of June 30, 2017, Felty emailed Fletcher and one of Defendant's benefits analysts to inform them that she would be returning to work on July 6, 2017. (Ex. Z to Fletcher Decl. (ECF No. 59-4); Def.'s SUMF ¶ 94; Pl.'s CSUMF ¶ 94.) Later that day, Felty emailed Fletcher, Gilooly, and Grady her letter of resignation, which indicates that her last day of work would be July 14, 2017. (Ex. AA to Fletcher Decl. (ECF No. 59-5); *see* Felty Dep. at 34-35 (admitting that she resigned and that it was her own choice).) Fletcher responded to Felty's announcement stating "I'm so very sorry to hear this. I wish we could have had an opportunity to speak directly before you made a decision like this. I enjoyed working with you and really wish it could have been longer. I view this as a big loss to the team and to Regeneron. I respect your decision and wish you the very best." (Ex. BB to Fletcher Decl. (ECF No. 59-6).)

Grady also reached out to Felty to ask whether she would be interested in a position in one of Defendant's other departments and put her in touch with the director of another department to discuss a potential position. (Grady Decl. ¶¶ 26-27; Felty Dep. at 270-71; Felty Decl. ¶ 27; Grady Dep. at 150; Def.'s SUMF ¶¶ 101-02; Pl.'s CSUMF ¶¶ 101-02.) Felty met with the director of the other department and then informed Grady that she would not take the position. (Grady Decl. ¶¶ 28-29; Def.'s SUMF ¶ 102; Pl.'s CSUMF ¶ 102.) Felty claims that she did not take the position because it was a demotion and she would have no direct reports. (Felty Dep. at 272, 283.) Grady avers and a text message Felty sent to Grady suggests that Felty was concerned that the new position would require more travel and she may be medically restricted from traveling. (Grady Decl. ¶ 29; Ex. V to Grady Decl.) Felty admits she told Grady that she was concerned about the travel involved in the other position but testified that the travel was not the real reason Plaintiff declined to take the position. (Felty Dep. at 273-75.)

Felty testified that she "returned for her two weeks." (Felty Dep. at 256, 270.) She also testified that when she left the company, she met with Gilooly who "apologized again for the [Cummins] situation, and she said it was the worst she had ever experienced in the years that she was working [for Defendant]." (Felty Dep. at 317.)

### F.    Procedural History

Plaintiff filed this action on June 21, 2018 (ECF No. 1), and amended her complaint shortly thereafter, on June 22, 2018 (ECF No. 4) and June 25, 2018 (ECF No. 9). Defendant answered on September 9, 2018. (ECF No. 17.) On September 19, 2018, the matter was reassigned to this Court. (ECF No. 20.) Magistrate Judge Judith C. McCarthy oversaw discovery (ECF No. 26), which was completed on October 14, 2019 (ECF No. 49). Currently pending before the Court is Defendant's motion for summary judgment (ECF No. 54), which Plaintiff has opposed (ECF No. 62), and in support of which Defendant has filed a reply (ECF No. 61).

**LEGAL STANDARDS**

## I.      Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if "there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir.1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is

not significantly probative, summary judgment may be granted*." Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

## II.    Employment Claims

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Similarly, the NYSHRL states that it is "an unlawful discriminatory practice" for an employer, based on an individual's sex, "to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. State Exec. Law § 296(1)(a). "[A] hostile work environment is one form of disparate treatment on the basis of" membership in a protected class. *Raniola v. Bratton*, 243 F.3d 610, 617 (2d Cir. 2001). "Whereas other disparate treatment claims may scrutinize discrete harms such as hiring or discharge, a hostile work environment claim analyses a workplace environment as a whole to discover whether it is "abusive." *Id.* (citing *Harris v. Forklift,* 510 U.S. 17, 22 (1993)). In addition, both Title VII and the NYSHRL have anti-retaliation provisions. 42 U.S.C. § 2000e-3(a); N.Y. Exec. Law § 296(7).

Title VII and the NYSHRL claims are evaluated under the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), *See, e.g., El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 932-33 (2d Cir. 2010) (per curiam) (retaliation claims); *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims.").

Under the *McDonnell Douglas* framework, the plaintiff must establish a *prima facie* case. 411 U.S. at 802. The plaintiff's burden at this stage is "minimal" or "de minimis." *Weinstock*

*v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (describing burden for discrimination claims); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (describing burden for retaliation claims). Once a plaintiff has made a *prima facie* case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas,* 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

Upon the defendant's proffer of a non-discriminatory reason, the presumption of discrimination arising with the *prima facie* case "drops from the picture," *Weinstock,* 224 F.3d at 42 (citing *Hicks,* 509 U.S. at 510–11), and the "final and ultimate burden" then returns to the plaintiff to demonstrate that "defendant's reason is in fact [a] pretext for unlawful discrimination," *Cortes*, 802 F.3d at 231; *see McDonnell Douglas,* 411 U.S. at 804; *Weinstock*, 224 F.3d at 42. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted) (citation omitted). Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (internal quotations omitted)). "In short, the question becomes whether the evidence,

28

taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

Where a plaintiff alleges discrimination or retaliation by a co-worker rather than a supervisor, Plaintiff must demonstrate that defendant "either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it. An employer will be liable in negligence for a . . . hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriate remedial action." *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 72 (2d Cir. 2000) (alteration and internal citations omitted); *accord Bentley v. AutoZoners, LLC*, 935 F.3d 76, 90-91 (2d Cir. 2019). "An employer need not prove success in preventing harassing behavior in order to demonstrate that it exercised reasonable care in preventing and correcting sexually harassing conduct. However . . . if harassment continues after complaints are made, reasonable jurors may disagree about whether an employer's response was adequate." *Whidbee*, 223 F.3d at 72. Reasonableness in the employer's response, rather than perfection, is the standard imposed by law. *Knabe v. Boury Corp.,* 114 F.3d 407, 412 (3d Cir. 1997).

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent. At the same time, . . . the salutary purposes of summary judgment-avoiding protracted and harassing trials-apply no less to discrimination cases than to other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks, citations, and alterations omitted.) As in any other case, a plaintiff in an employment discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' She must come forth with evidence sufficient to allow a reasonable

jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal citations omitted). "[C]onclusory statements," *Flores v. United States*, 885 F.3d 119, 122 (2d Cir. 2018), and "affidavit[s] that contradict[ ] the party's previous sworn testimony," *In re Fosamax Prods. Liab. Litig.*, 707 F.3d 189, 193 (2d Cir. 2013), cannot defeat summary judgment.

## DISCUSSION

Felty avers that she was subjected to a hostile work environment and discrete acts of disparate treatment on the basis of gender and that reporting such discrimination also resulted in unlawful retaliation. The Court will address each claim in turn.

## I.    Retaliation

### A.    *Legal Standards*

To make out a prima facie case of retaliation, plaintiff must establish "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal quotation marks omitted). "Protected activity is action taken to protest or oppose statutorily prohibited discrimination." *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quotation marks omitted).

Title VII and the NYSHRL protect "the filing of formal charges of discrimination . . . as well informal protests of discriminatory employment practices." *Littlejohn v. City of New York*, 795 F.3d 297, 317 (2d Cir. 2015) (quoting *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990)). "While it is unnecessary for an individual to specifically invoke the word discrimination when complaining in order to alert her employer to her protected activity, there must be some basis to conclude that the employer was aware that the plaintiff engaged in protected activity." *Lucio v.*

30

*New York City Dep't of Educ.*, 575 F. App'x 3, 6 (2d Cir. 2014); *see also Sherman v. Fivesky, LLC*, No. 19-CV-8015 (LJL), 2020 WL 2136227, at *7 (S.D.N.Y. May 5, 2020) ("although complaints need not mention discrimination or use particular language, ambiguous complaints must make the employer aware of the alleged discriminatory misconduct to put the employer on notice"). Further, "[t]o establish that his activity is protected under Title VII, a plaintiff need not prove the merit of his underlying discrimination complaint, but only that he was acting under a good faith, reasonable belief that a violation existed." *Sumner*, 899 F.2d at 209.

Accordingly, Courts have held that a letter merely alleging that demotion was "illegitimate and contrary to law" "is too general to indicate that [the plaintiff] was protesting his demotion as discriminatory. *Natofsky*, 921 F.3d at 354 (citing *Lucio*, 575 F. App'x at 6); *see McDowell v. T-Mobile USA, Inc.*, 307 F. App'x 531, 534 (2d Cir. 2009) (rejecting plaintiff's claim, based on his testimony regarding his intent, that he had "implicitly" complained about racial discrimination despite "undisputed" record "that plaintiff never explicitly complained about racial discrimination in any of his oral complaints"); *Jain v. Tokio Marine Mgmt. Inc.*, No. 16CV8104, 2018 WL 4636842, at *8 (S.D.N.Y. Sept. 27, 2018) (complaints of "harassment" or "unfair treatment" without any mention that victim viewed aggressor's actions as racially discriminatory not protected activity).

B.     *Application*

    1.     <u>Prima Facie Case</u>

        a)     *Protected Activity*

Felty clearly believes that Cummins mistreated her because of her gender. The question, though, is whether her complaints about Cummins were such that Defendant knew or should have known that she was complaining about unlawful gender discrimination or merely about his inappropriate behavior more generally. Plaintiff avers that she first complained to her supervisor,

Fletcher, regarding Cummins' allegedly discriminatory behavior in February 2017. Fletcher avers that Plaintiff complained about Cummins' behavior, including "that Cummins had raised his voice at [Felty] during a performance review meeting" on March 16, 2017, and that Fletcher had numerous conversations with Thompson and Grady about how to address Cummins' behavior (Fletcher Decl. ¶¶ 12-14), but does not mention whether Plaintiff ever expressed to Fletcher her belief that she was being subjected to gender-based discrimination.

Plaintiff further avers that she reported Cummins' allegedly discriminatory behavior to Grady and Thompson on March 17, 2017. Defendant admits that Plaintiff raised concerns regarding Cummins with HR on March 17, 2017 but avers that her complaint was insufficient to put Defendant on notice that that she was complaining about unlawful discrimination as opposed to generalized workplace grievances. In support of this position, Defendant relies on Thompson and Grady's accounts of conversations with Felty regarding Cummins' behavior.

The conflicting accounts by Plaintiff on the one hand and Grady, Thompson, and Fletcher on the other raise a material factual dispute as to whether Plaintiff informed Defendant of her belief that Cummins was discriminating against her on the basis of her gender. *See, e.g.*, *Meyers v. Medco Health Sols., Inc.*, No. 09 CIV. 09216 RKE, 2012 WL 4747173, at *7 (S.D.N.Y. Oct. 4, 2012), *reconsidered in part on other grounds*, No. 09 CIV. 09216 RKE, 2015 WL 1500217 (S.D.N.Y. Mar. 31, 2015) (holding that there was a dispute of material fact regarding whether plaintiff engaged in protected activity where plaintiff testified that her harasser treated her differently than her male colleagues and defendant contended that plaintiff testified that she could not recall whether she reported gender-based discrimination specifically, the people she purportedly reported to unequivocally said that she did not report gender discrimination, and plaintiff lacked any notes of such complaints despite other detailed contemporaneous notes).

32

But the standard is not just whether Defendant knew; a defendant can be liable if, based on the circumstances, the employer should have known that an employee was engaging in protected activity. Plaintiff's contention that she engaged in protected activity must be viewed in the context of the accounts of Kemp, Cummins' former supervisor, who avers that she raised concerns to Defendant that Cummins' targeted misbehavior was motivated by his beliefs toward gay people and women. Kemp avers that she raised such concerns with her boss, Rivenburgh, in the Spring of 2016 (Kemp Dep. at 59; Kemp Decl. ¶¶ 10-12, 17, 20), and with HR (*Id.* ¶¶ 13, 15). This evidence that prior to Felty's complaints supervisors and HR had been warned that Cummins' behavior was discriminatory toward gay people and women could lead a reasonable jury to conclude that Defendant should have understood Felty to be making a complaint about discrimination rather than general workplace grievances at least by March 17, 2017. Cf. *cf. Lenzi v. Systemax, Inc.*, 944 F.3d 97, 113 (2d Cir. 2019) (holding that plaintiff made a *prima facie* case of retaliation where plaintiff's email alleging disparate payment relative to *peers* "standing alone" might not establish protected activity, it was sufficient when read in context of subsequent discussion in which plaintiff stated that she was "concerned that [she] wasn't paid relative to peers and . . . [she] wanted to be treated similarly to the males," which is how such claims must be evaluated).

> b)   *Adverse Action*

The Court next considers whether Plaintiff has suffered an adverse action. In the context of a retaliation claim, "an adverse employment action is any action that 'could well dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (quoting *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 57 (2006)). The Supreme Court has advised that

> Context matters. The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which

33

are not fully captured by a simple recitation of the words used or the physical acts performed. A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children. A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight. But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*White,* 548 U.S.

Plaintiff avers that after she complained about Cummins' behavior toward her, Defendants denied her request that Cummins be supervised by someone else and simultaneously prohibited her from assigning him any work, which significantly increased Plaintiff's work and decreased Cummins' work, and significantly impeded her ability to do her job as a supervisor to Cummins and others. Courts have held that a disproportionately heavy workload can constitute an adverse employment action. *See Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir. 1997) (holding that increasing an employee's workload may be an adverse action for the purposes of a retaliation claim if the increase is heavily disproportionate to those similarly situated); cf. *Feingold v. New York*, 366 F.3d 138, 153 (2d Cir. 2004) (stating that an excessive workload allocated disparately based on membership in a protected class could amount to adverse action in Title VII discrimination claim). Felty provided unrebutted testimony that her hours increased after she complained on March 17, 2017.

Plaintiff further avers that Defendant's actions coupled with Cummins' increasing dismissiveness and lack of cooperation—including his refusal to attend meetings or sign a form for an audit he had attended—stripped her of her ability to do her job. *See Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) (holding that plaintiff should be allowed to testify about likelihood of her harasser being insubordinate because "whether he would comply . . . may affect [plaintiff's] ability to perform her job"); *see also Kirkweg v. N.Y.C. Dep't of Educ.*, 633 F.

App'x 40, 41 (2d Cir. 2016) ("Acts that humiliate or undermine an employee's authority with subordinates can constitute adverse action supporting a claim for retaliation whether or not accompanied by any pecuniary injury" (citing *Howley*, 217 F.3d at 154-55)). Accordingly, this case is distinguishable from *Mathirampuzha v. Potter*, in which the Second Circuit determined there was no adverse employment action because after the alleged assault "the plaintiff continued to work at the [same place,] in the same position, at the same pay, and with the same responsibilities. Indeed, there is no evidence that the assault brought lasting harm to the plaintiff's ability to do his job." 548 F.3d 70, 79 (2d Cir. 2008). Because the conditions Defendants imposed on her materially altered Felty's ability to do her job, they constitute adverse employment actions.

Accordingly, the Court finds that Plaintiff has adduced evidence from which a reasonable jury could conclude that following her complaint to HR, Defendant subjected Plaintiff to conditions that would deter a reasonable employee from challenging discrimination.

*c)   Causal Connection*

Viewing the facts in the light most favorable to Plaintiff, after she complained, her workload increased while that of her harasser was significantly diminished. Accordingly, the Court finds that Plaintiff has met the de minimis prima facie burden.

2.   <u>Non-Discriminatory Reason</u>

Defendant's only justification for requiring Plaintiff to continue supervising Cummins and prohibiting her from assigning him work is that Irish law prevented them from changing Cummins' supervisor while the disciplinary charges were pending. However, Defendant has failed to adduce any legal authority or admissible evidence that it was so bound by Irish law. In fact, the only evidence regarding the constraints of Irish law is in the form of testimony from Defendant's US HR employees, Thompson and Grady who aver that colleagues in Ireland told them about these

35

constraints and both admitted that they were themselves unfamiliar with Irish law. Such statements are hearsay, and are therefore inadmissible. Accordingly, Defendant has failed to proffer a legitimate non-discriminatory reason for subjecting Plaintiff to the aforementioned conditions.

***

Accordingly, the Court must deny Defendant's motion as to the retaliation claim.

## II.     Hostile Work Environment

### A.     *Legal Standards*

To prevail on a hostile work environment claim under either Title VII or the NYSHRL, a plaintiff must show: "[1] that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, and [2] that a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (internal quotation marks and citations omitted). Finally, (3) the plaintiff must show that the employer "create[d] such an environment because of the plaintiff's sex" or another protected classification. *Patane v. Clark*, 5008 F.3d 106, 113 (2d Cir. 2007).

"In a situation such as this, when the harassment is attributable to a coworker, rather than a supervisor, . . . the employer will be held liable only for its own negligence." *Duch v. Jakubek*, 588 F.3d 757, 762 (2d Cir. 2009) (quotation marks omitted, alteration in original).

### B.     *Application*

Even assuming that Cummins' harassment was severe or pervasive, Plaintiff has failed to adduce sufficient evidence from which a reasonable jury could conclude that Cummins discriminated against her because of her gender. Plaintiff's evidence that Cummins' behavior was motivated by gender animus is one sexually inappropriate comment and one homophobic comment coupled with various instances of Cummins becoming aggressive towards her and his previous female supervisor when receiving feedback. While Plaintiff and Kemp both aver that they believe

that Cummins had gender-discriminatory beliefs that caused him to act aggressively towards them and other females on the team, they point to no specific gender-based language that confirms that Cummins held such beliefs. Additionally, they both admit that all of Cummins' aggression toward female employees occurred when he was receiving feedback. Plaintiff essentially asks the Court to adopt her opinion and that of her former supervisor without that Cummins was aggressive because they were women not because they were giving him feedback.

Lacking evidence of Cummins' motivation, Plaintiff hangs her hat on a quad of cases that she avers make her evidence sufficient under a "totality of the circumstances" analysis; however, all four cases are readily distinguishable.

The first two cases hold that where a harasser has made discriminatory comments, the discrimination can be imputed to other, facially neutral incidents. In *Kaytor v. Elec. Boat Corp.*, the court vacated in part a grant of summary judgment in favor of an employer whose employee was alleged to have engaged in "continuous sexual harassment by means of his insulting and degrading remarks and actions and his threats to kill [the plaintiff]," where the trial court had explicitly disregarded admissible evidence that the alleged harasser had made certain statements but that those statements had not been directed at the plaintiff or "sexual in nature." 609 F.3d 537, 548 (2d Cir. 2010). The court held that "[e]ven if they did not evince sexual desire, a factfinder would be entitled to take them into consideration in assessing the work environment and in determining whether the abuse to which McCarthy subjected Kaytor was motivated by her gender." *Id.* In *Pucino v. Verizon Wireless Commc'ns, Inc.*, the court found that the defendant's foreman (who supervised the plaintiff) "subjected women to disparately harsh working conditions . . . [including] the disparate assignment of work in dangerous areas and the refusal to provide assistance to female workers that was provided male co-workers" in addition to "constant use of

the word ["bitch"] over several years in the context of the present record was sex-based and reflected hostility to women." 618 at 118. Plaintiff has not adduced sufficient evidence of explicit gender-based discrimination to impute such discriminatory motive to the various instances in which Cummins became aggressive while receiving feedback.

The third case held that the record supported a reasonable inference of sex-based hostile work environment where on separate occasions the defendant directed physical threats at three female employees, including plaintiff, but there was no evidence whatsoever that defendant physically threatened men and defendant's "most extreme outbursts were directed at women." *Castagna v. Luceno*, 558 F. App'x 19, 21 (2d Cir. 2014). Even if, as Plaintiff avers, Cummins' most severe outbursts were directed at women, the present case does not contain the same clear disparate treatment where Defendant's investigation concluded that Cummins was aggressive toward both male and female employees.

The final case held that explicit racial and sexual language coupled with physical threats amounted to a hostile work environment on the basis of race and gender discrimination where a supervisor's repeated use of racial terms including "nigger," and "spic," as well as testimony that he remarked "the only other job you [Hispanic] people can do is sweep the floors in McDonald's," coupled with gender-based remarks such as "women should be barefoot and pregnant" in conjunction with "repeatedly . . . backing [plaintiff] into the wall." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 571 (2d Cir. 2000). Again, a single facially neutral physical incident such as the March 16, 2017 in-person meeting does not become gender-based discrimination without some additional evidence of discriminatory intent.

In sum, Plaintiff has provided no authority and the Court is aware of none under which the personal opinions of the Plaintiff and one of her former colleagues regarding the intent of an

alleged harasser is sufficient to raise a dispute of material fact as to Cummins' intent. Accordingly, Plaintiff has failed to adduce sufficient facts from which a reasonable jury could conclude that Plaintiff was subjected to a hostile work environment because of her gender.

## III.   Gender-Based Discrimination

### A.   *Legal Standards*

To establish a prima facie case of gender-based discrimination, a plaintiff must demonstrate that "(1) she was within the protected class; (2) she was qualified for the position; (3) she was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

### B.   *Application*

Defendant concedes that Plaintiff meets the first two elements of the prima facie case as she is a woman and was qualified for the position. (Mem. in Supp. 8-13.) Even if Plaintiff can demonstrate that Defendant subjected her to least one adverse employment action, she fails to adduce any evidence that Defendants' actions were motivated by her gender.

First, the only incident Plaintiff cites in which anyone other than Cummins mistreated her because of her gender was a single phone call with Irish HR staffer Healy. Even if Healy's comment that perhaps Plaintiff was overly sensitive was a gendered comment, Plaintiff has not adduced any evidence that Healy had any ability to alter the conditions of her employment in any way. Accordingly, any alleged discrimination by Healy is not cognizable.

Second, to the extent Plaintiff contends that she was constructively discharged, she is mistaken. "Constructive discharge of an employee occurs when an employer, rather than directly discharging an individual, intentionally creates an intolerable work atmosphere that forces an employee to quit involuntarily. Working conditions are intolerable if they are so difficult or

unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Whidbee*, 223 F.3d at 73. Plaintiff avers that she was constructively discharged because Defendant so grossly mishandled its investigation into Cummins' behavior that she was forced to resign. This argument fails because, even if Defendant mishandled the investigation, Plaintiff did not resign under conditions that would force a reasonable person to resign. Even if Plaintiff may have reasonably feared that while Cummins was on leave and still under her supervision, he could return to torment her at any time, the possibility of this occurring disappeared when Cummins resigned on May 23, 2017. Since Plaintiff admits that she was aware that Cummins had resigned before she submitted her own resignation, her insistence that she decided to resign before she learned that Cummins had resigned is inconsistent with the timeline and, even if true, would not change the fact that at the time Plaintiff resigned, Cummins no longer worked for Defendant.

Because Plaintiff has failed to adduce evidence from which a reasonable jury could conclude that Defendant took an adverse employment action against her because of her gender, the Court must grant Defendant's motion as to the discrimination claim.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED as to Plaintiff's retaliation but GRANTED as to the hostile work environment and employment discrimination claims. The parties are directed to appear for a telephonic pre-trial conference on April 14, 2021 at 11:30 am. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest. The Clerk of Court is directed to terminate the motion at ECF No. 54.

Dated:      March 8, 2021
            White Plains, New York

SO ORDERED:

HON. NELSON S. ROMAN
UNITED STATES DISTRICT JUDGE